# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN and DEBORAH BETZ, : No. 4:15-cv-00851
as Parents and Legal Guardians of :
I.B., a Minor, : (Judge Brann)
:
      Plaintiffs, :
:
  v. :
:
ABBE SATTESON, SHIKELLAMY :
SCHOOL DISTRICT, PATRICK :
KELLEY, ERNIE JACKSON, and :
MARY MURPHY-KAHN, :
:
      Defendants. :

## MEMORANDUM

## April 25, 2017

Some might say it was a child's scooter, like a marble dropped into a Rube Goldberg machine, which set the chain-reaction events of this case into motion. The more cynical among us, however, would label that a puerile retelling of events. To those cynics, the true catalyst of misfortune was not an innocent toy, but instead was flagrant insubordination and unapologetic disrespect. Unfortunately for Plaintiffs, the applicable law has as its foundation precisely that skeptical view.

While a seventh grader at Shikellamy Middle School in Sunbury, Northumberland County, Pennsylvania, Plaintiffs' minor son interfered with a teacher's attempt to discipline another student. That other student had ridden a

scooter down one of the school's internal ramps shortly after dismissal one Friday afternoon. In turn, Plaintiffs' son stuck his arm out to hold the teacher back and shouted at his classmate to run free. When two teachers then turned their attention to him and requested that he accompany them to the principal's office, he too attempted to leave the building.

The record is uncontroverted that the boy attempted his botched escape by ducking under one of the teacher's outstretched arms and darting in the direction of a heavy glass door. As might be predicted, he banged his head against the door's metal push bar and cut his scalp. Consequently, what otherwise was a freak accident—or perhaps a timely form of divine retribution—has festered into a federal litigation assigned to me.

Though each reader will have to decide for himself the philosophical impetus for the young man's injuries, the legal questions that this motion presents are not so deep. First, the record suggests that the teacher who has been sued neither purposefully made contact with Plaintiffs' son nor intended him any harm. Second, even if contact was made, she was permitted to do as much under an established doctrine that affords teachers ample leeway to meet valid pedagogical ends. Therefore, because no genuine disputes of material fact remain, even when the events are viewed in the light most favorable to the Plaintiffs, summary judgment in favor of the Defendants is granted in full.

# I. BACKGROUND

## A. I.B. was a thirteen-year-old boy who suffered from Attention Deficit Disorder, had a prior disciplinary record, and possessed a remarkable penchant for injuring himself.

I.B. was a thirteen-year-old seventh grader at Shikellamy Middle School in Sunbury, Northumberland County, Pennsylvania on February 21, 2014—the date of the accident.[1] He has two older brothers and a younger sister. Both he and his sister had been homeschooled by their mother since shortly after that time.[2] According to Deborah Betz, I.B.'s mother, she made the decision to pull I.B.'s sister from public school shortly after the accident because she "had become increasingly agitated, started losing sleep, crying a lot, and just saying that she was scared to go."[3] Similarly, she decided to homeschool I.B. because "I.B. is a typical boy, and sometimes he does things that he shouldn't do."[4] "I only had boys," Mrs. Betz said, "and all boys that I had at that time were rambunctious. They were busy, very busy, wanting to run and play and jump."[5] "Sometimes he says things that he

---

[1]   I.B. Dep., ECF No. 24 Ex. 1, at 7:10–15; 9:04–05; 26:20–21.

[2]   Id. at 9:11–14; 10:18–11:01

[3]   Deborah Betz Dep., ECF No. 24, Ex. 12, at 12:25–13:03.

[4]   Id.

[5]   Id. at 25:24–26:03. For example, Mrs. Betz noted that I.B. once walked up to another student at lunch and hit him on the head because the other student had allegedly been bullying him by calling his family members crude names. Id. at 35:02–36:17. After receiving unsatisfactory responses from the school district, I.B.'s parents allegedly reached out directly to other schoolchildren in an effort to corroborate the details of the incident—a disturbing trend that they continued throughout the course of this litigation. Id. at 38:20–25 ("We contacted their parents and asked if we could talk to their kids.").

shouldn't do. Typical boy stuff. You know, picking their nose or farting in class, whatever."[6] "But that's one of the things with his medication," she explained.[7] "I was told that by the doctor, that they pick, because I went to the doctor and said, 'Why is he picking his nose all the time?' Why is he constantly picking at his skin?' because he started getting rashes. And she [the doctor] said, 'It's from the medication. It's a side effect from the medication.'"[8]

No child is perfect. Like any "typical" seventh-grade boy, the leading actor in this drama has certain talents and shortcomings, certain strengths and weaknesses, so to speak. In 2016, I.B. had reached the ninth grade, studying Algebra II, language arts, psychology, literature, United States history, and United States Constitution. He completes his homeschooling lessons five days a week, but admirably ventures to his schoolbooks at times on the weekends if he gets bored.[9] I.B. hopes to attend Westchester University one day to study psychology.[10] His brother who attended Westchester told him that "it's lovely there."[11] His mother confirmed as much, "He's always been one that enjoyed learning. He will sit and watch the National Geographic all the time. He'll get on his phone, and he'll look

---

[6]   <u>Id.</u> at 16:16–24.

[7]   <u>Id.</u> at 24:07–08.

[8]   <u>Id.</u> at 24:08–17.

[9]   I.B. Dep. at 12:14–13:06.

[10]   <u>Id.</u> at 21:19–22:05.

[11]   <u>Id.</u> at 22:06–22:08.

up facts about ancient pyramids, and he'll say, "Mom, did you know such and such is—?' And I'm like, 'No.' He always enjoyed—loves, loves, loves to learn."[12]

I.B. is no pushover either. Quite the contrary, he is an avid wrestler who has partaken in that sport "ever since [he] can remember," even while homeschooled.[13] For I.B., wrestling is "the sport that [he] love[s]."[14] At the time of his deposition, he wrestled at the 145-pound weight class.[15] Wrestling practices at Shikellamy are a grueling experience. As I.B. recollected, those events could last hours, anywhere from about 2:35 p.m. to 5:00 p.m., after which time, he and his teammates might even go to Bucknell University or Shikellamy High School and wrestle at those facilities.[16] In fact, it would not be uncommon for Shikellamy wrestlers like I.B. to "roll out the mats" on a Saturday.[17]

I.B. wants to wrestle until he graduates and continue on a club team in college.[18] He had a winning record during 2016, until a broken collarbone ended his season.[19] He also played football as a linebacker, a safety, and an offensive

---

[12]  D. Betz Dep. at 29:04–13.

[13]  I.B. Dep. at 13:10–19.

[14]  Id. at 14:23–24.

[15]  Id. at 14:01–02. At the time of the incident, I.B. stated that he weighed closer to 100 pounds and was somewhat shorter in stature. Id. at 63:01–02.

[16]  Id. at 14:08–14.

[17]  Id. at 14:15–18.

[18]  Id. at 15:13–15.

[19]  Id. at 14:02–03.

back during the third through sixth grades.[20] Unfortunately, I.B. suffered a concussion playing football in the third or fourth grade in 2010 and a subsequent injury the following year, both of which ultimately caused him to suffer optical nerve damage and temporary blindness.[21] According to I.B., however, he took vitamins and grew out of the temporary loss of sight.[22]

I.B.'s young life appears to be marked by a certain lack of inhibitions. The winter before his deposition, for instance, I.B. also broke his toe wrestling.[23] As I.B. recalls, someone stole his wrestling shoes, and he did not want to miss practice.[24] So, he decided to wrestle barefoot, and his toe caught got in between the mats.[25] Because of that injury, he missed the remainder of the wrestling season.[26] Next year's wrestling season was also shortened when he broke his collarbone during a match.[27]

Shortly after the accident that birthed this case, I.B. also broke his nose when a playground friend who was swinging on a climbing ladder inadvertently

---

[20] I.B. Dep. at 15:23–16:08.

[21] Id. at 16:12–18:11.

[22] Id. at 18:12–16.

[23] Id. at 18:17–19:06.

[24] Id. at 18:24–19:06.

[25] Id. at 18:24–19:06.

[26] Id. at 19:07–10.

[27] Id. at 20:02–21:10.

kicked him in the face.[28] Later on, I.B. was seen by his doctor when his cat bit him.[29] I.B. attempted to pick his cat up because another wild cat was outside of the house, and when he did, the cat bit him.[30]

Approximately two months after the incident at the center of this case, I.B. was also hospitalized in the emergency room to reverse the symptoms of an apparent accidental poisoning. I.B. stated that he believed he was drinking eggnog that his family purchased at a local supermarket, but he woke up in the middle of that night vomiting.[31] When his mom asked if he drank anything, he said he drank the eggnog in the fridge, and she sad "What eggnog? I didn't buy eggnog."[32] It turned out that I.B. had apparently consumed some sort of body cream that was being stored in the fridge.[33]

Besides organized sports, I.B. is also an avid bike rider. When he was younger, his parents bought him a used bike that they would buy custom parts for, and he "loved that bike."[34] In the summer, he would ride is bike every day for

---

[28] Id. at 35:10–22.

[29] Id. at 155:06–09.

[30] Id. at 155:09–14.

[31] Id. at 155:15–25.

[32] Id. at 156:05–06.

[33] Id. at 155:19–20.

[34] Id. at 30:16–17.

"miles and miles."[35] Beyond occasional swimming or weightlifting with friends, I.B. also enjoys mowing the grass. He finds it "pretty peaceful."[36]

That being said, a quiet mind has not always been easy for I.B. to find. In particular, I.B. takes medication for Attention Deficit Disorder ("ADD").[37] He believes that he has had ADD since approximately the fourth grade.[38] In fact, I.B.'s mother explained she gave ADD medicine to at least one other of her boys.[39] When he doesn't take his medication, I.B. says, "I will talk. I'll move around. I'll be able to like look you dead in the eyes, but I'll be thinking of something else. Like I'll be telling myself I need to focus, I need to focus, I need to focus, but my body won't be focusing. It will be focusing on me telling myself to focus."[40] He takes the medication every day, except on days when wrestling matches are scheduled because "in wrestling, you have to act. You have to do it on instinct," but the medicine "just slows [him] down."[41] I.B. recalls taking his ADD medication on the date of the accident.[42]

---

[35] Id. at 30:21–31:05.

[36] Id. at 31:10–24; 33:02–04.

[37] Id. at 28:10–12.

[38] Id. at 28:13–16.

[39] D. Betz Dep. at 26:09–17.

[40] I.B. Dep. at 29:21–30:04.

[41] Id. at 28:20–29:08.

[42] Id. at 28:17–19.

I.B.'s condition was known by school administrators. Dr. Mary Murphy-Kahn was the principal of Shikellamy Middle School on February 21, 2014.[43] By virtue of her position, Dr. Murphy-Kahn would handle student discipline.[44] Dr. Murphy-Kahn was well-acquainted with her students, and I.B. was no exception. "I was [I.B.]'s principal when he came to seventh grade," she explained.[45] Dr. Murphy-Kahn described I.B. as a "superb student" academically.[46] "He's an excellent student."[47] On the other hand, she also noted that the school previously had several "disciplinary issues with him."[48] In fact, several of I.B.'s teachers and administrators previously met with his parents to set up "a behavior contract" system through which I.B. could "earn points" by behaving respectfully:

> Q.    Okay. And can you describe the extent of those?
>
> A.    Prior to the incident, we had team meetings with [I.B.'s] parents about some behavior issues in classrooms. We had a behavior contract put into place just prior to this, I believe.
>
> Q.    What's a behavior contract?
>
> A.    It was just to kind of outline certain behaviors that we were seeing in the classroom to try to see if—it was a point system. And if he had a great day, we'd give him the points, and if he didn't, he wouldn't get certain points in certain classes. And I

---

[43]    Kahn Dep., ECF No. 20 Ex. 6, at 11:15–16.

[44]    Id. at 12:16–20.

[45]    Id. at 32:13–15.

[46]    Id. at 32:16–17.

[47]    Id. at 32:17–18.

[48]    Id. at 32:19–21.

don't have it in hand, certain things like "Stay in the Seat," or you know, "Wait until You're Called upon." I don't know if those are the exact things, but that would be certain things that you would see.

. . .

Q.    Okay. So is it fair to say that you handled these disciplinary issues by instituting this contract, explaining it to the student?

A.    Yes.

Q.    And the parents, and then implementing some kind of point system for—?

A.    Yeah. We had lots of communication at home. He occasionally would serve detentions.[49]

Well before the accident, Shikellamy Middle School had put into to place an individualized plan for I.B. under Section 504 of the Rehabilitation Act, as a consequence of his ADD diagnosis.[50] Superintendent Patrick Kelley also knew I.B. before the accident.[51] According to Mr. Kelley, "I assisted . . . with an incident when he was in sixth grade."[52]

---

[49] Id. at 32:22–34:10.

[50] Id. at 34:11–17.

[51] Kelley Dep., ECF No. 20 Ex. 7, at 24:10–12.

[52] Id. at 24:14–18. Although the record is unclear as to what precisely constituted that earlier "incident" with I.B., a public record reveals that I.B. may have been involved in a school vandalism incident that resulted in a hearing before the school board involving whether a wrestling coach was justified in disciplining I.B. See, e.g., "Crowd Supports Coach as Sworn Testimony Heard," available at http://www.wqkx.com/1070_WKOK/NEWS_ARCHIVES/010312.htm; "Coach off the Carpet and Back on the Sidelines," available at http://www.wqkx.net/newsupdates/94kxnews/coach-off-the-carpet-and-back-on-the-sidelines/. I make no judgment as to the merits of these stories, but do note them for the record.

This case does not represent the first time that I.B. (or his parents) have been dissatisfied with the treatment they have received during academic or extracurricular endeavors. In fact, I.B. explained that he ultimately quit football because it was "political."[53] "It's who you know," as he explained.[54] I.B. felt like the football team "was a friends and family network," where the coaches "would choose their family and friends to be on the first string."[55]

Likewise, I.B. explained that his parents also permitted his younger sister to be homeschooled because "she was afraid to go into the middle school . . . afraid of the one teacher I had in the sixth grade."[56] I.B. claims to have "had difficulty with her." In particular, he avers that this teacher forged his writing on an exam and thereafter altered his grade.[57] The teacher had gone to school with I.B.'s parents, so they "got along with her for a while," until the alleged tampering occurred.[58]

I.B.'s mother has been unemployed for at least the past 15 years.[59] During his deposition, I.B.—rather oddly in my view—described her as "the wonderful

---

[53] Id. at 23:06–08.

[54] Id.

[55] Id. at 22:19–23.

[56] Id. at 25:16–20.

[57] Id. at 26:03–13.

[58] Id. at 26:04–06.

[59] D. Betz Dep., ECF No. 24, Ex. 12, at 9:24–10:05.

woman who educates me."[60] His father is "a landlord and a salesman."[61] At times, his father will ask I.B. to do odd jobs at the rental properties, and if he "put[s] time and work into it," then his dad "will pay [him] good."[62]

Prior to the accident, I.B. did not know any of the teachers who were involved apart from having seen them occasionally around the school.[63] Teachers at Shikellamy teach in "teams," and I.B.'s parents "thought it would be best if [he] had other teachers."[64]

**B.     I.B. interfered with a teacher's attempt to discipline another student by holding her back with his arm, then ducked his head down and darted toward a heavy, glass door, bumping himself against the door's metal push bar in the process.**

A brief statement of the law is necessary to adequately frame the facts of this case. Federal courts within the vicinage of the United States Court of Appeals for the Third Circuit apply the following four factors to determine whether a teacher's conduct constituted excessive force:

(1)     Was there a pedagogical justification for the use of force?;

(2)     Was the force utilized excessive to meet the legitimate objective in this situation?;

---

[60]  I.B. Dep. at 33:14–16.

[61]  Id. at 33:17–21.

[62]  Id. at 34:09–16.

[63]  Id. at 36:12–20.

[64]  Id. at 36:21–22.

(3)     Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and

(4)     Was there a serious injury?[65]

February 21, 2014 was a Friday, and like most middle-schoolers, I.B. was excited to conclude the school week at 2:35 that afternoon.[66] I.B. would typically walk home from school upon his dismissal.[67] On that day in particular, he planned to go straight to the local YMCA with at least two other friends, where the three would shoot hoops and lift weights.[68] One of the boys' parents was scheduled to pick the group up from school and drive them there.[69] I.B.'s parents had previously approved that arrangement.[70] "Yeah, I called them. I let them know," I.B. testified.

I.B. lived within walking distance of his school, so he was used to walking home rather than riding a school bus.[71] This meant that on February 21, 2014, he was using the same exit he always used, what the parties have called the "field house" exit. That was the exit where people who were being picked up by cars or walking home would leave.[72]

---

[65]   Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001).

[66]   I.B. Dep. at 37:25–38:05.

[67]   Id. at 37:12–17.

[68]   Id. at 38:06–16.

[69]   Id. at 38:18–23.

[70]   Id. at 38:24–39:02.

[71]   Id. at 37:12–16.

[72]   Id. at 39:03–25.

<u>Figure 1. Fieldhouse Exit Lobby</u>[73]



After I.B. went to his locker for the final time that school week, he and his two friends began walking down the hall toward the fieldhouse exit. At the same time, eighth-grade math teacher Abbe Satteson caught another student (M.E.) riding a scooter. She walked M.E. back up the hallway, so that he could leave the school in a proper manner. The parties do not dispute that portion of the narrative, which is corroborated by the images below[74]:

---

[73]  All photos have been captured from Shikellamy Middle School's surveillance cameras, which were active on the date in question. The videos were submitted by the parties pursuant to an Order of this Court. A copy of the electronic file is stored physically in the case file in the District Court's Chambers, as well as on the District Court's electronic shared drive.

[74]  <u>See</u> I.B. Dep. at 43:06–44:20. (Q. Did you ever find out if that's why he was —? A. Yeah. Q. Apparently he rode a scooter? A. Because me and my mom, we were just—like we wanted to know why the teachers were there, or why that all happened. And we wanted to get to the bottom of this basically.).

Figure 2. Student with Scooter Exits



Figure 3. Ms. Satteson Walks Scooter Student Back



Upon turning around, Ms. Satteson and M.E. found themselves directly behind I.B. and two of his friends. In the photos below, I.B. is the student depicted in the middle of the front row.[75] He is wearing blue jeans and a blue long sleeve shirt with a small embroidery on his upper left chest. He also appears to be holding a prohibited electronic device, such as a cell phone or media player:

Figure 4. Ms. Satteson and M.E. Turn behind I.B. and Friends



---

[75] See id. at 241, 243, & 249.

Figure 5. Close-up of I.B. Holding Electronic Device



Ms. Satteson holds a bachelor's degree in mathematics and education from Bucknell University, as well as a master's degree from the same institution's instructional specialist program.[76] She had served for thirteen years as an eighth-grade mathematics teacher at Shikellamy Middle School at the time of the accident.[77]

At least once a year, she recalls attending in-service programs on strategies for dealing with students who were "unruly or challenging."[78] Over the course of her employment, the district's emphasis on dealing with disorderly students waxed

---

[76] Satteson Dep., ECF No. 20 Ex. 2 at 11:17–25.

[77] Id. at 12:07–17.

[78] Id. at 14:10–11; 14:16–18.

and waned.[79] "One year that might be a really big focus and another year maybe not so much."[80] One of the biggest lessons Ms. Satteson took from such programs was to first attempt a non-confrontational approach. For instance, she might ask a student, "Why is the phone out?" rather than demanding that he "Put that cell phone away!"[81] Such an approach helps her to "ask the question, rather than making the accusation."[82]

Dr. Murphy-Kahn testified that prior to this accident, she was not aware of (and had never received) any complaints about Ms. Satteson, during her thirteen-year career, becoming involved in a physical altercation with a student:

> Q.    Now, just so I'm clear, are you aware of any parent or student making any complaint about Abbe Satteson either before or after this incident?
>
> A.    Other than Mrs. Betz, grading issues.
>
> Q.    Okay. Any other complaints about physical, you know, contact by any parent before or afterwards?
>
> A.    No.
>
> Q.    And is there anything in the personnel file that reflects that there were ever any complaints?
>
> A.    No.

---

[79]  Id. at 14:20–25.

[80]  Id. at 14:24–25.

[81]  Id. at 15:11–19.

[82]  Id. at 15:19–20.

Q.    You're saying there were no complaints about Abbe Satteson other than maybe grades?

A.    Correct.[83]

Superintendent Kelley also recollected the same, noting that apart from run of the mill disputes about grades to which every teacher is subject, Ms. Satteson was a model employee and was in fact "the best math teacher at the middle school."[84] Mr. Kelley recounted the following event that transpired at an extracurricular event:

Q.    As superintendent for the school district, did you receive any phone calls of any nature regarding Abbe Satteson?

A.    It was not necessarily a phone call. I received a—a parent approached me, and I can't think of the name now—and actually there were a couple of them in a group at an event that I was at that said they were very appreciative because their child had Ms. Satteson because she was such a strong math teacher.[85]

Ms. Satteson testified that she followed policies and procedures implemented by her building's principal Dr. Murphy Kahn.[86] Ms. Satteson described attending "constant in-service[s] about different strategies to use with students."[87] Those strategies included "de-escalation," whereby the teacher would

---

[83]  Murphy-Kahn Dep., ECF No. 20 Ex. 6 at 81:16–82:08.

[84]  Kelley Dep., ECF No. 20 Ex. 7 at 48:20–49:02.

[85]  Id. at 48:07–19.

[86]  Satteson Dep. at 14:01–11.

[87]  Id.

attempt to "defuse the agitation."[88] Superintended Kelley would then review and approve in-service topics that building principals prepared.[89] He was also familiar with de-escalation strategies and ensured that his principals' instructions embodied such tactics.[90]

With that background in mind, the below photo shows the group progressing down the ramp toward the exit:

Figure 6. Ms. Satteson, M.E., I.B. and Friends Proceed to Lobby



When the group reached the lobby, the real trouble started—or rather, I.B. started to make trouble. As I.B. himself admits, "we were walking, and right about where the logo is . . . I put my arm up, and I go, 'go [M.E.], you're free to go!' . . .

---

[88] Id. at 17:12–20.

[89] Kelley Dep. at 18:10–16.

[90] Id. at 20:11–14.

and then we giggled."[91] When asked where precisely he "put his arm up," I.B. clarified that he put it up "in front of Ms. Satteson."[92]

During his deposition, I.B. made much of the fact that he believes no physical contact was made between his arm and Ms. Satteson's body. That is irrelevant under the law for two reasons. First, even a threat of force is sufficient to trigger the teacher's right to take disciplinary action—she need not wait for a violent student to harm himself or others before taking action.[93]

Second, because the surveillance cameras captured this portion of the incident and clearly reveal that physical contact was made, I.B.'s explanation must be disregarded pursuant to the decision of the Supreme Court of the United States in Scott v. Harris. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

---

[91] I.B. Dep. at 62:22–63:04.

[92] Id. at 69:12–14.

[93] See, e.g., ECF No. 24 Ex. 1 at 219 (Shikellamy Middle School Handbook sanctioning staff intervention upon "physical or verbal threat or attack") (emphasis added); Wayne v. Shadowen, 15 F. App'x 271, 287 (6th Cir. 2001) (affirming summary judgment in favor of school district defendants where underlying authority reasonably permitted student discipline in cases involving "the threat of force or violence") (emphasis added); Cucinotti v. Ortmann, 399 Pa. 26, 26 (1960) ("Generally speaking, an assault may be described as an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery."); Cooper ex rel. Cooper v. Lankenau Hosp., 616 Pa. 550, 561 n.6 (2012) ("[a] battery is an act done with the intent to cause a harmful or offensive contact with the body of another . . . and that directly [or indirectly] results in the harmful or offensive contact with the body of another").

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[94]

I find that the below progression clearly shows I.B. initiating physical contact with Ms. Satteson by holding her back with his left arm. It also shows him bending his body in an angular fashion and throwing the weight of his hips and his body against her so as to block her from reaching the exit. I.B. also appears to be using an electronic device in his right hand throughout the entirety of the altercation. I.B. and Ms. Satteson are depicted at the far left side of the images— Ms. Satteson wearing an olive jacket, and I.B. wearing a royal blue long sleeve shirt:

---

[94] In Scott v. Harris, the late Justice Antonin Scalia, writing for the Supreme Court of the United States, reversed the denial of summary judgment motion filed by a police officer defendant in a constitutional excessive force claim. The plaintiff in Scott was being pursued when he was rendered quadriplegic after an officer rammed his vehicle to end the chase. 550 U.S. 372 (2007). The case confirmed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. at 380. Justice Scalia observed, for instance, that "[f]ar from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." Id. at 380.

Figure 7. Progression: I.B. Blocks Ms. Satteson











As I.B. lifted his arm and blocked Ms. Satteson, he admits that he exclaimed "Go! Go! You're free to go!"[95] According to I.B., "I put my arm up," told my classmate to run, "and then we giggled."[96] Counsel for Defendants asked I.B. why exactly he put his arm up to Ms. Satteson:

Q.   You lifted your hand 90 degrees.

A.   Yeah

Q.   And that was to block Ms. Satteson?

A.   No. I was not blocking her. I wasn't stopping her.

Q.   Why did you put your arm up?

A.   As a joke.

---

[95] I.B. Dep. at 63:01–03.

[96] Id.

Q. And you said "Go! You're free!"?

A. Yeah.[97]

When asked whether he told the boy on the scooter that he would hold Ms. Satteson back, I.B. stated that he could not recall:

Q. Abbe Satteson recalls you saying, "Ride it now! I'll hold her back! Go ahead, ride it!" Did you say that?

A. No. I don't recall.

Q. You don't recall?

A. I don't recall me saying that all.

Q. Well, either you didn't say it, or you don't recall.

A. I don't recall. I'm almost positive—I can't say that either. No. I didn't say it.

Q. You didn't?

A. No.[98]

When examined as to whether, during the course of this altercation, he had broken any school rules (in addition to physically contacting Ms. Satteson), I.B. openly admitted that he had, because he did not have permission to exit the building when he attempted to do so:

Q. Did you feel the words that you said constituted a threat to Ms. Satteson by holding up your arm?

---

[97] Id. at 70:06–17.

[98] Id. at 99:10–24.

A. Like a life-threatening threat?

Q. Just a threat. It doesn't have to be life-threatening. Just a threat.

A. Not really because I was not using any force to—I didn't even touch her. Like I didn't even hold her back physically. I didn't even stop walking. We kept walking.

Q. Well, one of the—in Level 2, one of the rules of conduct is insubordination, failure to follow instructions. Now you were asked to go to the principal's office and you didn't; correct?

A. She asked if I needed to go to the principal's office.

Q. I thought—

A. Ms. Satteson said do you need—asked do you need to go to the office. I said no, but can I go? Then she asked I don't know. I think we need to go to the office.

Q. Okay. And Ms. Knopp said you need to go to the office; did she not?

A. Yeah. I'm pretty sure.

Q. And you refused?

A. Yeah.

Q. Okay. So would you agree with me that that was a failure on your part to follow instructions?

A. Yeah.

Q. Would you also agree that you left school without permission?

A. No. We had permission.

Q. Well, you didn't have permission from two teachers.

A. Well, at the end of the day, we have permission to leave.

Q. I thought you said a teacher can—after the school bell goes off, a teacher can take a student down to the principal's office if inappropriate conduct is done while walking through the hallways?

A. They can't stop you from leaving the building. That's what I believed.

Q. And one of the levels is unacceptable language. Obviously, you were in violation of that rule.

A. That was after the incident.

. . .

Q. Okay. Then why didn't you just go down to the first door? You had no obstruction at that time. Didn't you have a choice to go out the first door there, as opposed to walking under her?

A. No, because as Ms. Knopp stated yesterday, there was a constant flow of students going to her left, that is, to her left, going out that door. The doors were occupied. That was the closest door. That was my first intent, to escape.

Q. But as opposed to walking under her arm, you could have easily went to the first door; correct? That's all I'm asking.

A. May I explain it?

Q. Sure.

A. If there's a fire in the building would you run to that escape, or try to exit through that door, the gate, and then another door, and then the other door? Would you not rather just go through one set of doors?

Q. Well, there wasn't a fire in the building.

A. No, but what I'm comparing the fire to is Ms. Satteson and the teachers. The teachers are cornering me, and I'm trying to get out. I'm trying to move. I'm trying to get away.

Q.      And they told you not to leave; correct?

A.      They didn't tell me not to leave. They said do we need to go to the office? I think we need to go the office. They did not say I cannot leave.

Q.      I thought they said they're taking you to the office?

A.      That's not stating that I'm not allowed to leave. I just—I was uncomfortable. I had to leave. My ride was there.

Q.      All right. Are you saying you had permission to leave from those teachers then?

A.      No. I did not have permission.[99]

After I.B. held up his arm to block Ms. Satteson, she confronted him at the doorway and barred his passage from the school. The video surveillance still appears to show I.B. holding an electronic device in his right hand against his ear:

Figure 8. Ms. Satteson Confronts I.B.



---

[99]   I.B. Dep. at −172:19.

Again, the parties dispute little about this first portion of the encounter, I.B. having acknowledged full well that he did not have permission to leave at that time. When asked why she confronted I.B., Ms. Satteson explained, with a remarkably keen grasp of the core problem, as follows:

Q. Let me stop for you just a second. At this point in time, what had I.B. said to you, and what had you said, if anything back to him?

A. He had said to the student that he should take his scooter and ride it, and he—that I.B. would hold me back. And basically I.B. and I, I don't think, had much interaction other than for me to say, you know, it's not okay to tell another student do something that's against the rules.

It's not okay to do that in the real world, and it's not okay to do it at school. And he didn't seem to understand that, and I was trying to help him to understand that. As an educator we find ourselves sometimes trying to educate rather than just, you know—so, it's not thing right thing.

. . .

It seemed like more fair to help him to understand that it wasn't okay to do that. So then he walked away. He didn't want to hear what I had to say. He walked away. And then Mrs. Knopp—I don't know if he just—well, I guess, yeah, he went to the door where she was standing. And so then she talked to him for a little bit.[100]

As Ms. Satteson's testimony hints, I.B. completely rebuffed her and began walking toward another exit. This was confirmed by the video surveillance. He still

---

[100] Satteson Dep., ECF No. 20 Ex. 2, at 32:01–33:08.

appears to be holding an electronic device resembling a cell phone to his ear during

the entirety of the encounter:

Figure 9. Progression: I.B. Attempts to Exit from Another Door





I.B. was unable to exit through that door, however, because he was headed

off by another teacher, Ms. Jessica Knopp:

Figure 10: I.B. Is Met by Ms. Knopp at the Third Door



For the record, Ms. Knopp is not a named Defendant. When asked to explain

why she confronted I.B. and did not let him leave, she testified as follows:

Q.     The question is just to describe in chronological order what you experienced on that day.

A.     There was a constant flow of students coming out to my left when I heard something to the effect of "Go ahead and ride it, I'll hold her back," to which I turned around and saw the scooter student and I.B., and Ms. Satteson, kind of walking in front of him a little bit, said, "This is not appropriate." He then came around the doors to what would be my right. . . . I turned around and said something to the effect of, "This is not appropriate, this could be seen as a threat, you cannot talk to a teacher this way." And I said, "I think you need to apologize to her," and he made some reply of "I'm sorry." I said, "For what?" He said he didn't know. I said "For what you said. And if you can't remember, we should go to the office," and then [he] ducked under Ms. Satteson's arm. She was holding it open in the way pictured in [Exhibits] 1I and 1J. Ducked under, quite forcefully hit his head, walked several yards out to the middle

ground marker on 1J, the second pavement cement there. Held his head, walked back in, used some profanity to which I said, "Please watch your language." Then I saw the blood, and Ms. Satteson took him directly to the nurse.[101]

The below picture show Ms. Satteson joining I.B. and Ms. Knopp at the third set of doors:

Figure 11. Ms. Satteson Joins Ms. Knopp at the Third Door



Again, I.B. attempted to evade the teachers by walking back in the direction of the second set of exterior doors. Ms. Satteson followed him down the vestibule:

---

[101] Knopp Dep., ECF No. 20 Ex. 3, at 22:01–24:18.

Figure 12. I.B. Attempts to Exit from Another Door



At that point, the pair is out of view of the cameras, at which time I.B.

apparently ducks his head and is injured when he darts toward the door:

Figure 13. Out of View



The footage then shows I.B. returning inside, holding his head, with Ms. Satteson accompanying him to the nurse's office:

Figure 14. I.B. Returns Inside



Figure 15. Progression: Ms. Satteson Accompanies I.B. to the Nurse's Office







When asked to describe the incident, I.B. testified as follows, admitting that he ducked his head toward the ground and was not even looking at Ms. Satteson when he darted underneath her arm and toward the door:

Q. As I understand it you were trying to go under Ms. Satteson's arm?

A. Yes.

Q. And how did you do that?

A. I just ducked my head.

. . .

Q. That's what I thought. So when you ducked down, you actually could see straight ahead?

A. No. I as looking at the ground.

Q. You were looking at the ground?

A. Yeah.

Q. Then did you make—what did you make contact [with] first—with what?

A. What did my body make contact with?

Q. Yeah. You had contact with something. What was your first contact?

A. Her elbow hit my back of my shoulder blades.

Q. Back of the shoulder blades?

A. Towards the back of my neck, yes.

Q. Towards the back of your neck?

A.     Her hip came into—well, her lats and stuff came into my shoulder, and she would have pushed me down into the door.

Q.     So you're saying her left elbow would have pushed you—?

A.     Her right elbow.

Q.     Right elbow made contact with what part of your body?

A.     My shoulder blades, right back of my neck.

Q.     Your left shoulder blade?

A.     I can't recall which shoulder blade. It would have been around right in the middle of the back.

Q.     Right in the middle of the back, like right upper back?

A.     Exactly.

Q.     And then what else? What other contact was made?

A.     She pushed her hips or her body into me to try and stop me, I guess. I don't know what she was trying to do.

Q.     Her hips came in contact with what part of your body?

A.     It wasn't necessarily her hips. It was the hipping motion she used. But it was the side of her ribcage that came in contact with my shoulders.

Q.     Okay. So it was her ribcage that came in contact with your shoulders?

A.     Yeah.

Q.     And that would be your left shoulder?

A.     That would be my right. Her right elbow in my—.

Q.     Did you actually feel any impact from the door?

A.    No. My whole side of my head.

Q.    You didn't feel the impact at all to the door?

A.    My whole left side of my face went numb and a jolt went down my back. And I felt a slight pinch at the top of my head, and when I reached up and I pulled down, I felt all the blood, and it was warm.

. . .

Q.    And was [sic] there any words exchanged? I know you used profanities but did she say anything?

A.    I yelled, "My head, my fucking head! It hurts so bad!" And I said, "Look what you did!" And she said—and I heard someone scream behind me that—I mean, like yell, "Watch your language!" and then I heard her, her exact voice saying, "You brought this onto yourself."[102]

In my view, I.B.'s recounting of events, even taken in the light most favorable to him, is quite blurred and imprecise. It does not, for instance, suggest the level of force that Ms. Satteson used. It does not even suggest that she intended any contact whatsoever. The above recollection is just as akin to an accidental contact as it is a willful one, likely indicating that Plaintiffs have simply not put forth sufficient facts into the record creating a genuine dispute of material fact on the issue of intent. Were I to conclude otherwise, every schoolyard bump or bruise would be sufficient to survive summary judgment and make it to a jury trial in federal court on excessive force grounds. That simply cannot be.

---

[102] I.B. Dep. at 83:21–87:05; 90:21–91:06.

Moreover, even considering I.B.'s testimony in conjunction with that of all of the other eyewitnesses, I must conclude that Plaintiffs have still failed to adduce sufficient evidence to create a genuine issue of material fact. For instance, Ms. Satteson testified as follows:

Q.      Okay. So you're in the doorway, then what happens?

A.      I walked away from Mrs. Knopp. I think Mrs. Knopp told him that she thought he should go to the office so he could straighten things out. And he walked away from her and—

Q.      In which direction?

A.      Well, if—he would have been in the doorway to the foyer or whatever. He obviously came this way (indicating). And for some reason, with all the doors that he could have chosen to go outside, he chose to go out the door that I was holding open. And he ducked to go under my arm.

         This is [Exhibit] 1G. He ducked to go under my arm and somehow banged against the door. These doors are really heavy. Knocked the door, so that it bounced back and hit my elbow, and obviously caused his head to bleed.

Q.      Okay. Did you make any physical contact with I.B. as he banged into the door?

A.      I do not think that our bodies touched in any way.

Q.      Okay. So it's your testimony that you didn't touch I.B. at any point during this entire interaction?

A.      Not that I recall.

Q.      Okay. Did I.B. indicate that he was attempting or trying to go through the door that you were—?

A.     It was odd. He walked, stopped, and ducked. I don't know. I mean, I don't know how else to describe it.

Q.     Okay.

A.     It was very fast.

Q.     Was he using a walking pace as he entered the door?

A.     He was bent over when he went through the door with his head down.

Q.     Okay.

A.     To go under my arm presumably.

Q.     Okay. And how low did he have to bend down to get under your arm?

A.     Well, how high is my arm? Three feet? I don't know.

Q.     Okay. But it's your testimony that you were holding the door open and—. [Exhibit] 1G, you would have been holding the door open that way; correct?

A.     Yes.[103]

Similarly, Ms. Knopp testified as follows regarding the incident:

Q.     Now, you then became aware that there was something occurring behind you?

A.     Yes.

Q.     And what alerted you to that?

A.     Like I said previously, I heard the words go ahead, ride it, I'll hold her back. That's what alerted me were those words, which concerned me.

---

[103] Satteson Dep. at 41:24–44:04.

Q.     You indicated those words concerned you. What concerned you about those words?

A.     It sounded threatening to me. If I may say, I've had students use similar words to me, and I find that threatening to myself as a teacher and to other teachers. Being held back, a student making the . . . assumption that they're going to put their hands on another teacher concerns me.

. . .

Q.     And I believe your testimony is that you considered it a threat because of what he actually said?

A.     Yes.

Q.     All right. Was his voice raised at the time that he said it?

A.     It was loud enough that I could hear it between outside—. I would say that I'm looking at picture 1G. I would say that he would probably be around the emblem at this time as far as my recollection serves. And I was out here with students constantly flowing past. I can't say as to the volume, but it was loud enough that I could hear it clearly.

Q.     And then I believe you indicated that you heard this and so you turned around?

A.     Yes.

. . .

Q.     What do you recall as I.B. approached her? And take your time and be as specific as you can.

A.     I recall her having the door open, him saying he wasn't going to the office. How I feel was that he forcefully ducked and rammed through the door underneath her arm. Where he was, the door slightly moved, came back, got her, and he walked farther on. That's what I can give you.

. . .

Q.      I believe you testified that there was no actual impact between
        either I.B. or Mrs. Satteson?

A.      Right. Yes, I wouldn't say he rammed into her. It's just the
        action that it reminds of.[104]

Another eyewitness, Cody Bordner, offered his testimony of the accident.
Mr. Bordner was a graduate of Shikellamy High School and had been serving as a
volunteer track coach at the time.[105] Mr. Bordner was standing in the bottom right-
hand corner of the lobby, waiting for track practice to commence, and what caught
his attention was a middle schooler riding a scooter down the exit ramp: "I was like
oh boy, here we go."[106] Mr. Bordner continued on:

A.      And then what kind of brought my attention back then, I
        heard a boy say, "I'll block her, you ride the scooter!" So, he
        kind of blocked her. He got in front of her, and the boy on the
        scooter, and the other boy that was with him kind of went off to
        the side, and that's basically all I remember of those two boys.
        And then from what I remember the rest then, Ms. Satteson
        was—the boy had started walking down the ramp then and Ms.
        Satteson came and kind of got back in front her again or got
        back in front of him again. I apologize. And he kind of—the
        boy kind of proceeded to just keep going off to the side like to
        get around her. So this kind of went on for a little bit of him
        getting around her until probably standing right about in here in
        the lobby. So they were standing right about in the Shikellamy
        logo here.

        . . .

_____

[104]   Knopp Dep. 26:10–28:05; 36:11–21; 42:07–12.

[105]   Bordner Dep., ECF No. 20 Ex. 9, at 11:22–23; 18:13.

[106]   Id. at 19:03–20:16.

- 43 -

So yeah. They're standing probably right there at the time. And this is right around the time that Mrs. Knopp came over. So Mrs. Knopp just came into the scene because he didn't really seem to be respecting. He kept trying to get around her. He didn't really appear to be listening to what she was trying to tell him. And she just kept telling him to stop, and he wasn't stopping. He kept trying to go around. So, Mrs. Knopp came over and said, "Hey, she's a teacher, you're going to show her respect, and you're going to give her an apology. You're not going to talk to her like that." And I would say that at this point still, he—a lot of respect wasn't being shown. So, they said at this point, "We're going to go to the office." And he didn't go to the office with them. He was still—he made his way around to get away from them again.

And now they're probably directly right in front of the doorway here. So at that point, Mrs. Satteson was standing—this is like a perfect representation of how she was standing at the first door, not the second door like in this one. So she's kind of standing there with the door propped open like this.

. . .

So she was standing like this just at the inner door. Yeah. And at this point, they were all still saying like, "We need to go to the office." And at this point, he ducked down. So he lowers his head and ducks and goes right underneath her arm. And he just went right under, so then that would have been, they would have been going towards the second doors there then. Probably about 30 seconds later, I saw him come back in bleeding and swearing. He was swearing pretty good. And that's what I saw.[107]

A student eyewitness testified as follows:

Q.     And what do you recall hearing or observing at that time?

---

[107] Id. at 22:11–26:25.

A.      I remember looking at—the kid had a—there was a kid that had a scooter.

Q.      Right.

A.      And he was swearing I remember that And he was riding the scooter, I'm pretty sure. And Ms. Satteson was telling him to like stop, because obviously you don't ride a scooter in school.

Q.      Right.

A.      And I remember the kid had a friend with him. There was a kid with—there were two kids together that were—and the kid without the scooter was telling the kid with the scooter, like, "Come on, let's get out of here!" Because I think Ms. Satteson wanted to bring the kid back in for consultation or something because he shouldn't be riding a scooter.

Q.      Right.

A.      So his friend was trying to get him—like egg on, like, "Come on, let's just ditch her and get of here!" And I can't remember if this kid was on the scooter at this point. I remember them trying to make a break for the door, though. And Ms. Satteson, trying to stop them from getting out the door, got in front of them.

Q.      Right.

A.      And at this point they were exiting probably though the first set of doors and stepping into the carpeted area. And the kids then were going to try to exit the second set of doors.

Q.      Right.

A.      And I think the door got opened initially by the kid with the scooter, I think. And Ms. Satteson, trying to stop him from leaving—.

Q.      That's the kid that was with the kid with the scooter?

A.      The kid with the scooter. I think I.B. is his name. He tried to—
        he opened the door, like making like he was going to leave.

Q.      Right.

A.      And Ms. Satteson tried to stop him from leaving, I think, just
        put her arm on the door naturally as she was in front of him.

. . .

A.      And I think the kid tried to duck under her arm, which was on
        the door, hitting her arm. So it collapses her arm and then her
        arm wasn't on the door anymore, so the door came shut. And it
        hit the kid on the head.[108]

Another student eyewitness testified a follows:

Q.      It's two years ago. I don't expect you to. So you don't recall,
        but where was she located in front of the door? And it was the
        inner door. Was she still in the foyer/lobby area or was she at
        the door?

A.      I think when we first saw them, they were still in the foyer, in
        front of those two doors.

Q.      The two middle doors?

A.      Yeah.

Q.      And what happened? You tell me, what happened?

A.      I think I.B. tried to leave, and they weren't done talking to him,
        so Ms. McLaughlin [sic] blocked one door and Ms. Satteson
        blocked the other door and put her hand up. And when he went
        under it, I think when he came up, he smacked his head and
        that's how he—.[109]

Another student eyewitness testified as follows:

---

[108]   K.B. Dep., ECF No. 20 Ex. 10, at 18:07–22:10.

[109]   E.B. Dep., ECF No. 20 Ex. 11, at 25:12–26:07.

Q.    And you could actually see them through the glass?

A.    Yes.

Q.    But you heard them yelling?

A.    Yes. I believe this door was open or one of these doors were [sic] open. I'm not sure.

Q.    The interior doors?

A.     Yes.

Q.    And the third set of doors, interior doors, were closed but you could still hear them?

A.    Yes.

Q.    Do you know what they were saying?

A.    No.

Q.    And you don't know why he was being scolded or yelled at?

A.    Correct.

Q.    What's the next thing you remember?

A.    The next thing I remember is that Ms. Satteson went over to the exterior doors, and I.B. like bolted out, but I don't know why he bolted out. And then he came back in with his head bleeding.[110]

Even the student who was riding the scooter testified that I.B. did not have permission to leave, that I.B. clearly ducked underneath Ms. Satteson's arm, and that he bumped his head on the door in the process:

Q.    What do you recall seeing?

---

[110] D.W. Dep., ECF No. 20 Ex. 12, at 30:03–31:04.

A.    I recall seeing—she was—he was trying to get out, so she was standing in front of the—like in the doorway trying to like block him from leaving.

Q.    He wasn't permitted to leave?

A.    No.

Q.    Do you know why—you don't know why he was not permitted to leave, though; do you?

A.    No.

Q.    Then what did you observe?

A.    Then he tried to get underneath her arm, like so he could get out. And she shoved him into the metal door frame.

Q.    Well, how did she do that?

A.    She like shoved—pushed him, like she went sideways.[111]

Despite this particular student's inflammatory use of the term "shove," none of the actual facts that he recalls (for instance, that Ms. Satteson having moved sideways) objectively raise the specter of a constitutional violation.

Another student eyewitness stated as follows, recollecting similar facts that do not give rise to a constitutional excessive force claim as a matter of law:

Q.    Do you recall anything specific occurring?

A.    I remember I.B. like put his arm in front of Ms. Satteson, and he was like joking around. And he's like, "Go, M.E., it's the weekend, be free!" He said something like that.

. . .

---

[111]  M.E. Dep., ECF No. 24 Ex. 2, at 24:14–25:08.

Q.     And they were standing there doing what?

A.     Ms. Satteson was like yelling at I.B., I guess.

Q.     Do you know why?

A.     For putting his arm in front of her and saying like go free, it's the weekend.

Q.     All right.

A.     And then that.

Q.     And what do you recall next?

A.     And then she put her arum up in front of like—because I.B. tried to like leave. She put her arm up to stop him, and she kind of like thrust her hips a little bit a [sic] like his head the door.[112]

Another student made nearly identical comments, testifying that to the extent the pair came in contact, it involved nothing more than "a bump":

Q.     And did you actually see him go under her arm?

A.     Yeah.

Q.     And you were over here to the left side; right?

A.     Yeah.

Q.     And did it happen quickly? This happened quickly; right?

A.     Yes.

. . .

Q.     Did he make any contact with her first before she did that, do you know?

---

[112] D.B. Dep., ECF No. 24 Ex. 4, at 17:23–18:04; 28:14–29:05.

A.    No.

Q.    Do you know, because he put his head down? Do you know if he made any contact with her?

A.    I don't think.

Q.    You don't remember?

A.    Well, when she hit him.

Q.    Pardon?

A.    When she hit him.

Q.    Well, when he was going through the door, what happened?

A.    That door?

Q.    Pardon?

A.    That one?

Q.    Yeah. What happened? He put his head down and went through the door. Then what happened?

A.    Then she pushed him.

Q.    Pushed him how, with the hip? Like a bump?

A.    Yeah.[113]

A final student eyewitness also confirmed seeing contact that did not exceed "a bump" and even offered that I.B. hitting his head on the arm bar occurred independently of that bump:

Q.    And then what did you see?

---

[113] A.F. Dep., ECF No. 24 Ex. 5, at 54:12–20; 55:18–56:16.

A.     She had like hip bumped him, and then she put her elbow down. And like as she hit him in the head, and then like he went to stand up, and he hit his head off of the push bar.

. . .

Q.     And what did you observe at that time?

A.     She hip bumped him and then she put her elbow down. And then he went to like get up like because I guess he was going underneath her arm, and like he hit his head off the push bar.

Q.     Did you actually see him go under her arm?

A.     Yeah, like when he went under, like —

Q.     Well, how did he go under?

. . .

Q.     And how did he go under arm though? He couldn't walk straight through; right?

A.     No, he went under.

Q.     How?

A.     Like her arm was this way, he went under it.

Q.     Could you demonstrate for me how he did that?

A.     Yeah I guess. So like here's her arm; right?

Q.     Yeah.

A.     He went under.

Q.     But how was he? Was like this or like this (indicating) or what?

A.     I don't know.

Q.     Oh, you don't know?

A. No. When I turned around, all I saw was—.

Q. Did he walk fast or was it rapidly?

A. I don't know.

Q. It just happened so quickly?

A. Yeah.[114]

I.B. was at the nurse's office for approximately one minute before she arrived.[115] The nurse then instructed I.B. to clean some of the blood from his scalp so that she could bandage him.[116] In another odd turn of events, I.B. admits that while he was cleaning himself up, he took several pictures of his head using his iPod, which he sent to his parents:

Q. I don't want you to guess. So she said go into the bathroom and clean up; correct?

A. Yeah.

Q. Now, why did you take a picture of yourself?

A. Because there was so much blood it wasn't even funny. There was blood on top of blood.

Q. I'm sorry?

A. There was blood on top of blood.

Q. Why did you take the picture, though?

A. I felt it would be important.

---

[114] S.Q. Dep., ECF No. 24 Ex. 7, at 48:08–48:13; 51:10–51:21; 52:07–53:05.

[115] I.B. Dep. at 111:12–15.

[116] Yordy-Splitt Dep., ECF No. 20 Ex. 5, at 24:15–25:15. I.B. Dep. at 113:02–08.

Q.    Important for what?

A.    My mom to see.[117]

Shortly after the nurse began bandaging I.B., Mrs. Betz entered the office. As the nurse described her, "Mrs. Betz came running in my office and was . . . hysterical, screaming, 'I want the teacher down here that did this to my kid!' And I said, 'My main concern right now is your kid,' and I said, 'He has a cut on his head, and it probably needs stitches. He needs to go to the hospital.' And no sooner I said that, they were out the door."[118]

Because the family home was located near the middle school, I.B. estimated that approximately three minutes elapsed between the time he was injured and the time his mother arrived.[119] Mrs. Betz admitted that she doesn't even remember how she got into the building when she arrived on scene. "I can't tell you. I can't tell you. I got in there. I was so hysterical. I was screaming, 'Where's my son?' Where's my son?'"[120] "I started screaming, 'Where is my son?' What happened? I didn't say who did this to my son. 'What happened to my son?' When nobody was answering me, I became frantic and just followed the puddle, followed the trail of

---

[117] I.B. Dep. 114:06–115:19; 116:05–08.

[118] Yordy-Splitt Dep. at 26:08–18.

[119] I.B. Dep. at 125:05–22.

[120] D. Betz Dep. at 53:12–15.

blood literally."[121] She admits she was using profanity, despite being in the presence of minor students and faculty members: "Oh yeah . . . 'Where is my fucking son?' 'Where is my kid?' 'What happened to my kid?'"[122]

During the course of his time at the hospital's emergency room, I.B. provided the following three accounts of what had transpired[123]:

Account #1:

"The patient states me and a kid were joking around in the hallway at school. A teacher started pushing me through a set of doors, preventing me from leaving the school. I fell into the door and started bleeding from my head."

Account #2:

"Child states that he and another student were joking around in the hallway at school. It was at the end of the day, and he was ready to leave. States two teachers blocked the doors. One of them asked him to apologize, and they had a verbal exchange. Child states he tried to duck down to get out of the door, and one of the teachers put her arm down, pushing him into the door. His head hit against the metal bar that is used to push open the door."

Account #3:

"Child states him and another student were joking around in the hallway at school. It was at the end of the day. He was ready to leave. States two teachers blocked the door. One of them asked him to apologize, and they had a verbal exchange. Child states he tried to duck down to get out the door, and one of the teachers squatted down,

---

[121] Id. at 54:03–11.

[122] Id. at 56:08–13.

[123] I.B. Dep. 133:19–136:16.

pushing him into the door. He hit his head against the metal bar that is used to push open the door."

Because Dr. Murphy-Kahn had taken one of her own children on a college visit that day, high school principal Ernie Jackson and Dr. Murphy-Kahn's office staff had been left in charge of handling any major, immediate issues that should arise that day. As Murphy's Law predicts, one did so arise.[124] Heidi Dorman, a guidance counselor and unsung heroine who fortified Defendants' litigation posture as it exists today, was in the office when I.B. and Ms. Satteson passed through to the nurse's wing. Ms. Dorman immediately sprang into action, doing what any thoughtful employee in this situation should. She recounted as follows during her deposition:

Q.    All right. Could you hear what was being yelled or screamed?

A.    Yeah, I heard Mrs. Betz say, "Where's my—

Q.    You can spell it.

A.    —f-ing kid." I don't want to say it out loud, which she was upset. I could tell she was upset. She was looking for her child. But I didn't even know who it was at the time. I didn't know it was her. I just heard somebody yelling. And as soon as I heard that, I went out into the hallway to see what was happening.

. . .

Q.    Well, what did you do in response to it? Did you go anywhere? Did you go back in your office or did you —?

---

[124] Murphy-Kahn Dep. 14:03–14:12.

A.    I didn't go back in my office. I think I stood there for a couple of minutes with the teachers. And then someone said that Ms. Satteson had followed I.B. to the nurse's office. And then I said what happened, and they said he hit his head. And I think I asked them—. I can't remember how I found out that someone thought it was—that Mrs. Betz thought it was one of the teacher's faults. And then I said we better write everything down. And that's when I called—I asked the teachers to send me people who were in the area to write down what they saw. I knew that there was not a principal in the building then, and I knew that if I didn't get people to write things down immediately, people tend to forget things if they don't write them down right away. So observable behavior is what I asked for. What did you see and what did you hear.[125]

According to Ms. Dorman, she took it upon herself to ensure that because a student had been injured, everything should be documented and written down.[126] She even separated the witnesses while they independently completed their statements, so that they did not confer with one another.[127] She also told them only to state "observable behavior" and not to speculate.[128] Ms. Dorman then dropped off the statements to the superintendent on her way home that afternoon.[129] During her deposition, Ms. Dorman was asked whether she discussed the incident on social media. She responded that she had not because she does not use social

---

[125]  Dorman Dep., ECF No. 20 Ex. 13, at 18:24–19:13; 22:08–23:10;

[126]  Id. at 27:12–25.

[127]  Id. at 24:01–21.

[128]  Id.

[129]  Id. at 29:19–23.

media. "You're a lucky person," counsel for Plaintiffs commented. "I'm a smart person," she responded.[130] Having thoroughly reviewed the record, I agree.

Around the same time, Mrs. Betz would call superintendent Kelley from the emergency room. "She indicated that I.B. had been injured at school and that she was with him."[131] When asked whether "she indicated that she had any concerns with respect to Ms. Satteson's conduct," Mr. Kelley stated that Mrs. Betz did not.[132] Mr. Kelley asked for permission to speak with I.B., and Mrs. Betz complied.[133] Mr. Kelley took the following notes as I.B. spoke to him: "They were screwing around, that he and M.E. were messing around. And M.E. stepped in front of it—. . . . But he stepped in front of Mrs. Satteson and said something, M.E. go free. . . . And then he said that she lunged herself in front of him, and he said that he went to duck under her and hit his head on the door."[134]

Dr. Murphy-Kahn emailed Mrs. Betz that Saturday and set up a meeting that Monday afternoon.[135] In the meantime, Dr. Murphy-Kahn also met with the Ms. Satteson, Ms. Knopp, and the identified eyewitnesses.[136] At the meeting, Mrs. Betz

---

[130] Id. at 32:21–25.

[131] Kelley Dep. at 25:18–20.

[132] Id. at 25:21–24.

[133] Id. at 26:06–11.

[134] Id. at 27:14–24.

[135] Murphy-Kahn Dep. at 37:17–24.

[136] Id. at 38:21–41:16.

provided Dr. Murphy-Kahn with pictures and with several witness statements that Mrs. Betz herself had asked some students to prepare.[137]

Shikellamy School District investigated the incident internally while also requesting an external investigation by law enforcement.[138] The police concluded their investigation in March 2014, finding that physical abuse charges against Ms. Satteson were not warranted under the facts of the case.[139] The School District closed its investigation later that fall, also concluding that any internal form of discipline was not appropriate under the facts.[140]

In Mrs. Betz's view, her son's conduct that day—interfering with Ms. Satteson, holding her back, ignoring the teachers' reprimands, and trying to flee— amounted to nothing more than "a joke."[141] "It was concerning me because I was thinking if my son got slammed into a door for telling a joke to another child in the presence of a teacher, and she felt justified for doing that, is it possible that somebody else could feel they have the authority to hurt my son again?"[142] "And he felt, I think his character was being—his integrity was being attacked."[143]

---

[137] Id. at 53:12–24.

[138] Id. at 52:20–25; 55:05–55:12.

[139] Id. at 53:07–12.

[140] Id. at 51:11–13; 55:05–12.

[141] D. Betz Dep. at 17:06–13.

[142] Id.

[143] Id. at 20:07–09.

Sometime thereafter, Mrs. Betz apparently visited the school to attempt to reintegrate I.B. She demanded that the school make certain concessions; one was that "this woman—one of our agreements was that she would not be around my son, and my son would not have any contact or have to see her."[144] "Before we left that room that day," Mrs. Betz continued, "I said, 'Who's on bus duty?' She said, 'I'm not sure.' I said, 'Well, make sure it's not Ms. Satteson, because I don't want my son the first day he comes out of school having to see her.'"[145] Apparently, Ms. Satteson was on bus duty that day, and when I.B. he saw her, he turned around, ran away so that no one could find him, and left through back doors that middle schoolers were not permitted to use.[146] "He was terrified! He was terrified!" Mrs. Betz claimed.[147]

Mrs. Betz also provided intimate details about her son's incident to a local satirized newspaper titled "Not the Item" (a tongue-in-cheek homage to Sunbury's "The Daily Item")—conduct well beyond what I have previously held in the past as sufficient to strip away the presumption of anonymity in certain litigations:[148]

---

[144] Id. at 20:22–21:01.

[145] Id. at 21:03–09.

[146] Id. at 21:21–22:22.

[147] Id. at 22:13–14.

[148] K.W. v. Holtzapple, 299 F.R.D. 438, 441 (M.D. Pa. 2014) (Brann, J.) ("Curiously, Plaintiffs' counsel himself appears to have invited media scrutiny of the instant action. Posting on the social media site Twitter.").

Q.	What is this thing, "Shikellamy School Board Stonewall Assault Investigation"?[149] What is that?

A.	That is "Not the Item."

Q.	What is it?

A.	It's called "Not the Item."

Q.	Oh.

A.	Gordon Lamb writes articles that he felt are being shoved under the carpet by the authoritarians in our community that kind of try and pull away from the truth of things.

Q.	So you provided him the information for this article?

A.	I did.

. . .

Q.	Did you or your husband ever receive a cease and desist letter from an attorney about—

A.	Yes, we did.

Q.	—Ms. Satteson and Ms. Knopp?

A.	Yes.

. . .

Q.	Was there any indications that it was defamatory or libelous?

A.	Yeah. That's what they said.[150]

---

[149] The article to which Mrs. Betz contributed is "School Board Stonewalls Investigation," Not the Item, (Nov. 20, 2014) available at http://www.nottheitem.com/tag/isaiah-betz/.

[150] D. Betz Dep. 120:07–121:17.

As discussed previously, Mrs. Betz used the satirized "Not the Item" article and other social media postings as springboards for reaching out to students who may have witnessed the incident or who had any grievance against Shikellamy School District or these particular teachers. Mrs. Betz then asked them to come over her house prepare a written statement or to do so on their own. One minor deponent testified as follows:

Q.    Do you know I.B.'s mom, Deb Betz?

A.    Yes.

Q.    And how do you know her?

A.    Well, we talked about when I went—it was last year, pretty sure, that I went into the interview for the TV and everything about what happened because she wanted to reach out to people, and she reached out to me, and I've had problem in the pas too, and I came forward with that.

Q.    All right. That is helpful. Did you know Deb outside of that incident that you've just described?

A.    Not 'til then.

Q.    And how did you discover her? Did she get in contact with you or did you contact her?

A.    I think she contacted me after I shared her post. And I also wrote on there about what happened to me.

Q.    And you indicated that you had shared a post. Where did you see this post? Was it a website?

A.    It was through "The Daily Item."

Q.    Do you recall when that article or post would have been made approximately?

A.    No, I do not. I can't remember that far back.[151]

Having reviewed all pertinent testimony, I note for the record that I make no credibility determinations at this stage. To that end, I have not weighed one witness's testimony versus the next or considered how many witnesses recollect a particular fact and how many do not. To the contrary, I have considered Plaintiffs' testimonial evidence, as well as those of the eyewitnesses who purport to have observed the accident, and even giving Plaintiffs the benefit of the most favorable inferences, their proffered evidence stops short of creating a genuine dispute of material fact as to whether unconstitutional excessive force was used. Summary judgment is therefore warranted in my view, as a matter of law, as discussed more fully below.

**C.    I.B.'s conduct violated numerous provisions of Shikellamy Middle School's Student Handbook, a code of conduct by which he had previously agreed to abide.**

All Shikellamy Middle School students are presented with the school's Student Handbook during the first few days of every new school year.[152] Each student reviews it in class with his teachers, as well as at home with his parents.[153] Each student also signs an acknowledgement confirming that he has read the

---

[151]  K.J. Dep., ECF No. 24 Ex. 3, at 14:20–15:24.

[152]  See Murphy-Kahn Dep., ECF No. 20 Ex. 6, at 71:02–72:05.

[153]  See id.

Handbook, understands its provisions, and agrees to abide by the regulations that it contains.[154] I.B. and his mother both signed an acknowledgment in this case.[155]

The Handbook contains a section entitled "Walking to and from School."[156] It states that "[w]hether a student is coming to or leaving school, appropriate behavior is expected."[157] It further clarifies that students who walk to and from school "are responsible for their behavior . . . and are subject to all regulations as defined in the Student Conduct and Discipline Code."[158] The Handbook also makes clear that its rules and regulations are not limited to the times when classes are in session, but apply equally to afterschool events, like student-teacher consultations, club meetings, athletic contests, school bus rides, and Saturday detentions.[159]

That same handbook contains a section called "Hall Conduct."[160] That section sets forth rules and regulations for periods of the day when "students mov[e] through the halls," whether class is in session or not.[161] The policy states

---

[154] See id.

[155] Those acknowledgments can be located in the record at ECF No. 24 Ex. 1 at 234–35.

[156] ECF No. 24 Ex. 1 at 233.

[157] Id.

[158] Id. (emphasis added).

[159] Id. at 211 (athletics); 216 (bus rides); 218 (policies apply "during the regular school day and at all school or District sponsored activities that may be held at times other than regular school hours); 219 (student-teacher consultations); 220 (clubs, dances, and detentions); 225 (hallways); 233 (walking to and from school).

[160] Id. at 225.

[161] Id. at 225 ("Hall Conduct" section will apply "often with classes in session.").

that when students are passing through the hallways, "it is very important that [they] must meet and follow these guidelines:

1. Avoid running or horseplay.

2. Stay to the right side of the hall.

3. Refrain from loud, talking, yelling, whistling, or profanity.

. . .

7. [S]tudents are expected to go directly to their destination and not loiter in the halls."[162]

The Student Handbook also prohibits the use of personal cell phones and other electronic communications devices during school hours.[163] Their use is also prohibited during afterschool activities and on bus rides home without permission.[164] "Cell phones and other communication devices are to be turned off and secured in the student's locker and/or person until the student exits the school building."[165]

In general, the Student Handbook sets forth three varying offense levels.[166] Level I misconduct, which appears to involve the lowest level of culpability, includes "[a]cts which constitute a violation of rules and regulations or acts which

---

[162] Id. at 225.

[163] Id. at 232.

[164] Id. at 232.

[165] Id. at 232 (emphasis added).

[166] Id. at 217–19.

may infringe on the rights of other students to obtain the best quality education."[167] Specific examples provided in the Student Handbook of Level I misconduct include: "bus misconduct"; "disruptive behavior"; "negligent behavior"; "unacceptable language"; "unauthorized area"; "unacceptable behavior"; and "use/possession of personal audio/video equipment."[168] When a student commits a Level I offense, the Student Handbook makes clear that the prescribed administrative responses include the following steps:

1. Staff intervention.

2. Student is referred to the administrator.

3. Administrator verifies the offense.

4. Parents are notified.

5. A complete and accurate record of the offense and disciplinary action is kept by the administrator.[169]

Importantly, "staff intervention" includes the following two options: "teacher implements appropriate managerial techniques" and "team review and intervention where applicable."[170]

The next category of misconduct is Level II, which includes "[a]cts which result from the continuation of Level I behavior and/or Level I violations which are

---

[167] Id. at 218.

[168] Id. at 218.

[169] Id. at 218.

[170] Id. at 218.

hostile or premeditated, and acts which constitute a threat to health, safety, and welfare of students and staff."[171] Examples of Level II infractions include "bus misconduct"; "failure to serve detention"; "fighting"; "insubordination (failure to follow directions)"; "leaving school property without permission"; and "unacceptable language/gestures."[172] Nearly identical administrative responses are prescribed for Level II violations as Level I violations.[173]

The final iteration, Level III misconduct, is comprised of "all Level II infractions which are chronic, and acts which are in violation of the state penal code or regulations established by government agencies."[174] Level III infractions include "bus misconduct," as well as "physical or verbal threat or attack directed at a staff member (in or out of school)."[175] Similar administrative responses are provided for Level III offenses, including the immediate removal of the student from the school setting.[176]

## II. LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be

---

[171] Id. at 219.

[172] Id. at 219.

[173] Id. at 219.

[174] Id. at 219.

[175] Id. at 219.

[176] Id. at 219.

interpreted in a way that allows it to accomplish this purpose."[177] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[178]"Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[179]

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[180] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[181]

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[182] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not

---

[177] Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

[178] Fed. R. Civ. P. 56(a).

[179] Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) and Celotex Corp., 477 U.S. at 322).

[180] Clark, 9 F.3d at 326.

[181] Id.

[182] Liberty Lobby, Inc., 477 U.S. at 252.

whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[183] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[184] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[185] Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[186] "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court

---

[183] Id.

[184] Id.

[185] Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson, 81 U.S. 442, 447 (1871)).

[186] Celotex Corp., 477 U.S. at 323 (internal quotations omitted).

demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[187]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[188] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[189]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[190] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

---

[187] Id.

[188] Liberty Lobby, Inc., 477 U.S. at 250.

[189] Fed. R. Civ. P. 56(c)(1).

[190] Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

undisputed for purposes of the motion."[191] On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[192]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[193] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[194] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[195]

## III. ANALYSIS

Because no genuine disputes of material fact remain, the Defendants are entitled to summary judgment on Plaintiffs' federal and state law claims.

### A. Summary Judgment Is Warranted As To Plaintiffs' Federal Claims Against Ms. Satteson.

#### 1. Ms. Satteson reacted to I.B.'s misconduct with a good faith effort to maintain and restore discipline—not maliciously and sadistically for the very purpose of causing harm.

---

[191] Fed. R. Civ. P. 56(e)(2).

[192] Fed. R. Civ. P. 56(c)(3).

[193] Liberty Lobby, Inc., 477 U.S. at 249.

[194] Id.

[195] Id. at 249–50 (internal citations omitted).

"We begin our analysis by recognizing the 'comprehensive authority' of teachers and other public school officials."[196] "[T]he nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults."[197] "Those officials involved in the educational process perform 'important, delicate, and highly discretionary functions.'"[198] "As a result, federal courts generally exercise restraint when considering issues within the purview of public school officials."[199]

"Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action."[200] With that basis, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."[201] In fleshing out such a standard, the Supreme Court of the United States has encouraged lower courts to remain mindful

---

[196] J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 925 (3d Cir. 2011) (Chagares, J.) (en banc) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 507 (1969)).

[197] Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 655 (1995).

[198] Blue Mountain Sch. Dist., 650 F.3d at 926 (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943)).

[199] Blue Mountain Sch. Dist., 650 F.3d at 926. See also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 864 (1982) ("[F]ederal courts should not ordinarily intervene in the resolution of conflicts which arise in the daily operation of school systems.") (internal quotation marks omitted); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) ("This standard is consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.").

[200] Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (internal quotation marks omitted).

[201] Id. (internal quotation marks omitted).

of the admonition of its fourth Chief Justice, John Marshall, when he wrote in M'Culloch v. Maryland that "we must never forget that it is a constitution we are expounding."[202] As Justice (later Chief Justice) William H. Rehnquist would go on to clarify, "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."[203] To that end, federal courts nationwide recognize that the Fourteenth Amendment "is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action."[204]

"To be arbitrary in the constitutional sense, an executive abuse of power must 'shock the conscience.'"[205] "It should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."[206] "Thus, we have made it clear that

---

[202] 17 U.S. 316, 407 (1819).

[203] Daniels v. Williams, 474 U.S. 327, 332 (1986).

[204] Neal ex rel. Neal v. Fulton Cty. Bd. of Educ., 229 F.3d 1069, 1074 (11th Cir. 2000) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998)).

[205] T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla., 610 F.3d 588, 598 (11th Cir. 2010) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848).

[206] Lewis, 523 U.S. at 848.

the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."[207]

"We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."[208] "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[209]

Gottlieb ex rel. Calabria v. Laurel Highlands School District, a decision of the Third Circuit that I discuss more fully below, set forth the applicable standard for due process claims in the educational context. The panel in that case explained as follows:

> To avoid conflating the various elements of the shocks the conscience test into a vague impressionistic standard, we analyze its four elements in turn: a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate

---

[207] Id.

[208] Id. at 848–49.

[209] Id. at 849. See also Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001).

objective in this situation?; c) Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?[210]

In enumerating those factors, the Third Circuit in Gottlieb relied upon an earlier refinement of the "shocks the conscience" standard by the United States Court of Appeals for the Fourth Circuit in Hall v. Tawney. The Fourth Circuit in Hall reasoned that "[a]s in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."[211] "Not every violation of state tort and criminal assault laws will be a violation of this constitutional right, but some of course may."[212]

Applying the factors set forth in Gottlieb necessarily brings this case to a swift end. Ms. Satteson's conduct was undertaken in reaction to several disciplinary violations committed by I.B. and had the primary purposes of

---

[210] Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 173 (3d Cir. 2001).

[211] 621 F.2d 607, 613 (4th Cir. 1980).

[212] Id.

maintaining order and instituting just punishment. It therefore was pedagogically sound and commensurate with the circumstances of I.B.'s misbehavior.

That Ms. Satteson simply should have let I.B. leave the grounds without permission and return to be disciplined on Monday is laughable. It is the faculty and administration that determine the appropriate manner and means of any discipline—not the student and certainly not his parents. Absent truly exigent circumstances, the student's or his parents' prerogatives need not be given any weight. This is true whether punishment occurs before, during, or after the regularly scheduled school day. That must be the law if our public schools are too run smoothly, guided by the reasoned direction of trained educators.

Moreover, in my view, delaying I.B.'s punishment would have diminished the seriousness of the situation and would have risked the deterioration of evidence or witness accounts. Needless to say, were I.B. not punished until the following week, I suspect that the administration would likely be receiving phone calls of a different tenor from his mother: if Friday's misconduct was so objectionable, why did the staff wait the entire weekend, until Monday or Tuesday, to call I.B. to the office?

The record is uncontested that I.B. stuck out his arm and blocked Ms. Satteson with his arm and the force of his body in an attempt to first, prevent her from disciplining a classmate and second, give that classmate time to run for the

school exit. Even I.B. admits that. Whether physical contact was actually made (and based on my review of the video footage, it most definitely was), Ms. Satteson was justified in responding the way she did based upon the force or threat of force to her personal safety that I.B. had just made. Objective testimony from a co-teacher, Ms. Knopp, confirmed the extent of the threat that the two employees perceived at that moment.

I note again for the record that I.B. in his deposition emphasized that he does not recollect coming into contact with Ms. Satteson when he attempted to hold her back in an effort to set his scootering classmate free. "I didn't even touch her. Like I didn't even hold her back physically."[213] In my view, that is contradicted by the video surveillance footage and also irrelevant, given that students in public school districts like Shikellamy are forbidden from threatening force against a teacher, and because an individual in Pennsylvania can commit an assault merely by causing an apprehension of imminent contact or a battery without even making direct contact with another's person.[214] I note, however, that Ms. Satteson has refrained from suing I.B. from what would otherwise be two claims with miniscule

---

[213] I.B. Dep. at 100:23–25.

[214] "[A]n assault is an act intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and . . . the other is thereby put in such imminent apprehension." Szydlowski v. City of Philadelphia, 134 F. Supp. 2d 636, 639 (E.D. Pa. 2001). "A battery, on the other hand, occurs when a person acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and . . . a harmful contact with the person of the other directly or indirectly results." Id.

damages—a lesson in good judgment and discretion that has perhaps escaped counsel for Plaintiffs in this and certain other cases brought before me.[215]

In addition, I.B. supplied a second, independent justification for Ms. Satteson's reaction when he refused to go to the office, evaded the teachers' questions, and then attempted to dart out of the building. Quite plainly, if I.B. subjectively believed that he had the teachers' permission to leave, it is rather strange that he simultaneously felt compelled to flee the building. And flee he did: in a fashion more appropriately suited to a wanted fugitive running from the police than an innocent schoolboy compliantly following protocol. Further, as he admitted in his deposition excerpts cited above, I.B. actually did not believe that he had the teachers' permission to do so. He simply disregarded their instructions and left the building on his own accord.

Importantly, any objective indicia of malicious intent on Ms. Satteson's part are entirely absent from the record. No witness testified that Ms. Satteson raised her voice or used foul language toward I.B. She did not reach out and grab his clothing. Neither did she put out her arms and forcefully push him. Her conduct was consistent with blocking a door to prevent the student's exit without permission, and under the circumstances of this case, such a response was clearly

---

[215] "Jury Sides with Trooper in Federal Lawsuit," Sunbury Daily Item, available at http://www.dailyitem.com/news/local_news/jury-sides-with-trooper-in-federal-lawsuit/article_551d9991-c2c5-5ceb-9077-cdc9e8763fbe.html (detailing the recent return of a defense verdict in a civil rights case following nineteen minutes of jury deliberations).

warranted. Schools could not operate appropriately were district courts to find otherwise. Plaintiffs have no smoking gun to present the jury that have not already proffered on summary judgment. Their case for intent will be no stronger at trial than it is on motions practice today.

Plaintiffs' sole fallback argument on the issue of intent appears to be that Ms. Satteson may have readjusted her weight or swung her hips in some fashion that resulted in bodily contact with the student after he had ducked his head and darted towards the door. As previewed earlier, this argument is unavailing because it is unsupported by sufficient evidence and because it does nothing to nudge the needle as a matter of law. As another federal court has explained in a similarly set excessive force case, "That said, even if there was a genuine factual dispute about whether Holtmeyer intentionally pushed Taylor, it is unclear why that dispute would be material. Such a push would not be unconstitutionally excessive force."[216] In addition, as the Third Circuit has observed in the excessive force context, "It is axiomatic that not every push or shove, even if it may later seem unnecessary, violates the Constitution."[217]

The record signals serious doubt that any reasonable jury would be able to conclude that Ms. Satteson made intentional physical contact with I.B. Certainly,

_____

[216] Taylor v. Holtmeyer, 183 F. Supp. 3d 962, 972 (D. Neb. 2016).

[217] Jones v. City of Jersey City, 45 F. App'x 196, 198 (3d Cir. 2002) (internal citations and quotation marks omitted).

however, based on the scant evidence before this Court, no reasonable jury would be able to conclude that Ms. Satteson engaged in any physical contact while intending to injure I.B. As the testimony cited above suggests, it is more likely than not that Ms. Satteson did not initiate any intentional contact whatsoever with I.B., and if such contact was made, it amounted to nothing more than a shifting of her weight, perhaps "a bump" as some witnesses described. Further, the testimony evidenced serious causation issues, with most witnesses indicating that I.B. himself made contact with I.B. as he darted toward the door or even made contact with the push bar when he was getting back up onto his feet. The evidence fails to unify itself around any particular course of events that would support Plaintiffs' claims as a legal matter, and that is detrimental at the summary judgment stage.

"Because a constitutional violation will only arise if [a teacher's] actions were malicious and sadistic, it is the harm, and not the contact, that must be intended."[218] To the contrary, the record is clear that her motives were adequately pedagogical and her methods were reasonably tailored to achieve those permissible ends. Moreover, the Court cannot view a single movement by a teacher to block the door in isolation. The chain of events leading up to this altercation involved significant misbehavior, including inappropriate use of force or threat of force, by the student.

---

[218] Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 175 (3d Cir. 2001) at 175 (emphasis added).

I note too that after I.B. hit his head, Ms. Satteson did not ignore his plight and leave him on the ground to suffer. Rather, she immediately accompanied him to the nurse's office. We need not speculate about any of this either. The events were all clearly captured on video surveillance recordings—which recordings would be played back to a jury.

> ### 2. The established rule from the Third Circuit's decision in <u>Gottlieb ex rel. Calabria v. Laurel Highlands School District</u> that "it is the harm, and not the contact, that must be intended" demands that summary judgment be entered in Ms. Satteson's favor.

The only factor that conceivably favors continuation of this action is the extent of the injury suffered, and even that factor's weight here is illusory. I have given considerable thought to this point in my review of <u>Metzger By & Through Metzger v. Osbeck</u>.[219] <u>Metzger</u>, a decision by our Court of Appeals from 1988, involved a junior high physical education instruction who lifted one of his students by the neck from the deck of a pool.[220] The teacher's lifting and restraining the boy appears to have resembled what might be termed a "choke hold" today.[221] At some point, the boy lost consciousness, fell face down onto the pool deck, and suffered lacerations to his lip, a broken nose, fractured teeth, and other injuries that required

---

[219]  841 F.2d 518, 521 (3d Cir. 1988).

[220]  <u>Id.</u> at 519.

[221]  <u>See</u> <u>id.</u>

hospitalization.[222] The student in Metzger had used "inappropriate language" when speaking with one of his female classmates.[223]

The minor student and his parents filed suit against the teacher and several other school district defendants.[224] The district court granted summary in favor of the defendants on all claims, and the Third Circuit reversed that grant only as it pertained to the due process claim brought against the teacher.[225] From the outset, affirmance of the grant of summary judgment in favor of the school district defendants was a straightforward result for the panel: "The other defendants were granted summary judgment as there was no school policy authorizing the conduct of which plaintiffs complained, there was no legal or factual basis for vicarious liability of the supervisors, and there was no showing that [the teacher] had received inadequate training."[226]

Turning to the individual due process claim against the teacher, however, the Third Circuit concluded that, on the particular facts of the case, a triable issue existed as to whether the teacher "intended to injure [the student] or recklessly disregarded a risk of injury of which he should reasonable have been aware."[227]

---

[222] Id. at 519–20.

[223] Id. at 519.

[224] Id.

[225] See id. at 520.

[226] Id. (quoting Monell v. Department of Social Services, 436 U.S. 658 (1978)).

[227] Metzger, 841 F.2d at 520.

This was especially true in light of the disproportionate nature of the disciplinary action when compared to the underlying offense. The court wrote it "believe[d] a reasonable jury could find that the restraints employed by [the teacher] . . . exceeded the degree of force needed to correct Metzger's alleged breach of discipline and that the substantial injuries sustained by Metzger served no legitimate disciplinary purpose."[228] This was supported by the fact that the implicated teacher severed "as a physical education instructor and wrestling coach" and "was aware of the inherent risks of restraining [the student]."[229]

Metzger thus stands for the proposition that summary judgment is likely inappropriate in educational due process cases where a reasonable jury might "believe that [the teacher] intended the consequences of his act or believed them to be a substantially certain result of it."[230] As a matter of law and based upon the scant factual record that Plaintiffs have presented, a reasonable jury could not conclude as much here. In particular, nothing in the record indicated that Ms. Satteson intended the harm that I.B. suffered or had any physical education training or any pre-existing familiarity with this student that would cause her to believe he was likely to sustain the injuries that he did. Rather, the mechanism of

---

[228] Id. at 520.

[229] Id. at 521.

[230] Id. at 521.

I.B.'s injuries was so unforeseeable and "freak" in nature that it is unclear whether such background would have even made a difference.

I would also contrast this case from Metzger in the sense that the student in Metzger was restrained simply for the sake of imposing restraint as a form of punishment—absent any attempt on the student's part to otherwise flee or elude a teacher's control. To the contrary, the present case (and those that more closely conform to the facts here) typically have involved some form of restraint only to the extent that such restraint was necessary to prevent a student from unauthorized ingress or egress on school grounds.[231] In that vein, the present fact pattern undoubtedly presents a more compelling case for the use of momentary restrictions, as ensuring everyone's safety and maintaining order may require incidental contacts. Those practical consequences make this second distinction a critical one.

The late Honorable Joseph F. Weis, Jr., issued a dissenting opinion in Metzger, in which he argued that the majority had allowed the extent of the plaintiff's injuries, unforeseeable as they were, to cloud its determination of constitutional liability. "If the injury were less substantial, I suspect the majority

---

[231] Certainly, Ms. Satteson was not, as in Metzger, indiscriminately plucking students from their bus lines and putting them in half-nelsons for the sheer sake of encouraging gentlemanly conversation toward one's female classmates.

would affirm the summary judgment here," he wrote.[232] The crux of Judge Weis's dissent, that the extent of a student's injuries is often a poor predictor of a teacher's intent, was well illustrated by the following passage:

> In my view, however, it is the intent to use excessive force—not the extent of injury—which is dispositive of the constitutional claim. The extent of injury at times may reflect the amount of force used or even suggest malice on the part of the state official. A savage beating, for example, may result in injuries that directly relate to the number and force of the blows. No such correlation exists here.
>
> Nor is the intent to cause physical contact a controlling element. A teacher who slaps an unruly child to enforce obedience in a classroom obviously commits a volitional act with intent to inflict pain. Those facts, however, do not establish a constitutional violation; they do not demonstrate the use of excessive force—the hallmark of abuse of governmental position.
>
> On the other hand, if the teacher hits a small child so hard as to knock her down a flight of steps with resulting serious injury, the intent to strike the pupil again is present. The evidence of intent to use excessive force could be perceived by the predictably serious injury resulting from the blow and the child's position atop the staircase.
>
> Other examples demonstrate the nuances of the problem. A teacher aims a light slap at a student's shoulder, but the pupil moves suddenly, deflecting the teacher's hand. As a consequence, the teacher's ring strikes the child's eye, resulting in a tragic injury. Or perhaps the teacher does no more than gently shove a disobedient child with a hidden impairment and causes an unforeseeable serious injury.[233]

Thus, for Judge Weis, "the critical element was "not the nature of the plaintiff's injury but the manner of the infliction of that injury," because "[t]he

---

[232] Id. at 522.

[233] Id. at 522.

focus on abuse of power is a prime distinction between constitutional violations and routine torts."[234] To that end, he also suggested that this misplaced emphasis had led the majority to conflate principles that determine the extent of tort damages, such as "taking your victim as you find him," with the threshold question of liability.[235] Penning a conclusion that rings just as true in the context of the present action, he advised that "[i]n devoting time and effort to litigation of this nature, federal courts deprive parties with cases raising federal questions of the attention they deserve. In my view, this case has gone far enough."[236]

As it so happened, the Third Circuit would later distance itself from the majority's stance in <u>Metzger</u> and would embrace Judge Weis's position in <u>Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.</u>[237] <u>Gottlieb</u> was brought on behalf a female student who started an argument with another classmate about a male student the two had both dated.[238] The plaintiff was brought to the assistant principal's office, where she was told that she was not allowed to return to classes until a parent-teacher conference was held.[239] According to the student, the

---

[234] <u>Id.</u> at 522–23.

[235] <u>Id.</u> at 523.

[236] <u>Id.</u> at 523.

[237] 272 F.3d 168 (3d Cir. 2001).

[238] 272 F.3d at 170.

[239] <u>Id.</u> at 170–71.

assistant principal then "told her to shut up . . . and pushed her shoulder with his hand, propelling her backwards into a door jam."[240]

The district court granted summary judgment in favor of the defendants on the plaintiff's due process claim, and the Court of Appeals affirmed, using the case as an "opportunity to clarify the standard we adopted in <u>Metzger</u>."[241] The determinative factor in <u>Gottlieb</u>, as in many similar excessive force claims against school personnel, was whether the force was applied in a good faith effort to maintain discipline or rather maliciously and sadistically for the purpose of causing harm.[242] Undoubtedly, the panel in <u>Gottlieb</u> foresaw that every incidental contact in the school setting could not, as a pragmatic matter, create a triable issue of fact. Seeming to cabin in its earlier language in <u>Metzger</u>, the court noted as follows: "Because a constitutional violation will only arise if [a teacher's] actions were malicious and sadistic, <u>it is the harm, and not the contact, that must be intended</u>."[243] Certainly, that clear statement of the law in <u>Gottlieb</u> would seem to nip this action in the bud.

Reiterating the requirement that the particular harm itself be intended, the Third Circuit went on to explain that summary judgment was inappropriate in

---

[240] <u>Id.</u> at 171.

[241] <u>Id.</u> at 172.

[242] <u>Id.</u> at 174.

[243] <u>Id.</u> at 175 (emphasis added).

Metzger only because the record contained "contradictory evidence of what the teacher intended."[244] The crux of this action, as recounted above, is that no such intent to harm can be gleaned from the record on summary judgment. In fact, quite the opposite is true.

This case aligns much more closely with the facts of Gottlieb, wherein the Third Circuit explained that its decision was predicated upon "the slight nature of the push" and the litigants' "own testimony."[245] "A slight push," like the one alleged here, "is very different than the choke hold applied in Metzger," the Court of Appeals noted.

I would take that line of reasoning to its fullest end: no push at all or inadvertent contact sustained during a teacher's attempt to block a door is very different from an intentional push. This must be the case if federal courts are to remain faithful to the time-tested doctrine that the Fourteenth Amendment is not a boundless source of rights that permits litigants to advance state tort claims in a federal forum. A steadfast commitment to federalist principles requires a more pragmatic view of things.

As the Third Circuit concluded in Gottlieb, the teacher's conduct "although possibly tortious, does not give Gottlieb a constitutional cause of action."[246]

---

[244] Id.

[245] Id.

[246] Id. at 175.

"[P]lacing his hand on a student's shoulders and moving her mere inches is not 'a brutal and inhumane abuse of official power literally shocking to the conscience.'"[247]

Courts within the Third Circuit's vicinage have exhibited a jaundiced view of excessive force claims in the educational context since <u>Gottlieb</u>, even on fact patterns far more troubling than the present one. For example, the Honorable James M. Munley, writing for this Court, in <u>Moeck v. Pleasant Valley Sch. Dist.</u>, entered summary judgment in favor of a wrestling coach who became exceptionally physical with a freshman wrestler. The freshman plaintiff in <u>Moeck</u> weighed approximately 140 pounds, but the coach forced him to wrestle a teammate who weighed upwards of 220 pounds.[248] While they wrestled, the plaintiff's opponent became angry and pushed him through a set of double wooden doors, causing him to land on the floor of a nearby hallway.[249] The coach called the student "a pussy" and told him to "get his ass back into the room."[250] When he reentered, plaintiff's larger teammate punched him in the head.[251]

---

[247] <u>Id.</u> (quoting <u>Hall v. Tawney</u>, 621 F.2d 607, 613 (4th Cir. 1980)).

[248] <u>Moeck v. Pleasant Valley Sch. Dist.</u>, No. 3:13CV1305, 2016 WL 1535866, at *2 (M.D. Pa. Apr. 15, 2016).

[249] <u>Id.</u>

[250] <u>Id.</u>

[251] <u>Id.</u>

At that time, the freshman plaintiff decided that he had had enough of the practice and began to leave the gymnasium.[252] Several coaches taunted him with vituperations like "faggot."[253] The student then told one coach to "fuck off" twice.[254] The coach sprang to his feet, grabbed plaintiff's arm and "power-walked him to a wall in the gymnasium."[255] The wall was padded for approximately six feet, above which there were exposed cinderblocks.[256] Judge Munley described the ensuing conflict as follows:

> At the wall, Defendant [teacher] grabbed plaintiff by the shirt and lifted him on his tiptoes, causing plaintiff to hit his head on the cinder block wall. [The teacher's] forearm rose to just below plaintiff's neck. [The teacher] yelled at [the student] that he is not his "fucking" parent and that he should not treat him as if he were. Then he let [the student] go, and [he] fell to the floor on all fours. [The student] made his way to a garbage pail and began to vomit a foamy substance into it. Evidently, an anxiety attack caused [the student's] symptoms although initially he thought he had suffered an asthma attack. His mother arrived at the school and took him to the hospital emergency room.

> While on the floor recovering his composure, a teammate asked the coach if he could bring [the student] some water. The coach said, "No, leave him." [257]

Judge Munley granted summary judgment in favor of the teacher, finding that, as a matter of law, "no evidence exists that defendant intended to harm

---

[252] Id.

[253] Id.

[254] Id.

[255] Id.

[256] Id.

[257] Id. at *2–3.

plaintiff."[258] According to Judge Munley, this absence of intent was fatal, as

Gottlieb made clear that "the defendant must do more than intend the physical

contact; he must intend to harm the plaintiff."[259] Importantly, upon surveying the

pertinent case law, he observed that "[w]hile this treatment may not have been the

most prudent or best course of action for the coach to take, there is nothing

unusually sadistic or inhumane about it."[260] "Taking everything into

consideration," Judge Munley concluded, "we find that the instant situation is more

like the push into the door jamb where we cannot infer an intent to harm."[261] Of

note, Judge Munley narrowly denied a subsequent motion for attorney's fees and

costs pursuant to Rule 11 for the ignorance to controlling legal principles

demonstrated by counsel for Plaintiffs in Moeck.

     Other members of this Court have reached the same conclusion on similar

fact patterns. For instance, the Honorable Robert D. Mariani granted summary

judgment in favor of an assistant principal who "yanked" a student by her arm.[262]

Before his elevation to the Third Circuit, the Honorable Thomas I. Vanaskie

granted summary judgment in favor of a teacher who "grabbed [a male student's]

---

[258] Id. at *4.

[259] Id.

[260] Id. at *5.

[261] Id.

[262] Schmidt v. Freeland, No. 1:11-CV-1782, 2013 WL 4083761, at *2 (M.D. Pa. Aug. 13, 2013).

shirt and punched him in the chest."[263] In addition, the Honorable A. Richard

Caputo granted summary judgment in favor of a teacher who had allegedly shaken

all of the items out of a student's desk, called him derogatory names, forced him to

sit by an open window in the winter, took his crutches away after he sprained his

ankle, and improperly handled his strawberry allergy.[264]

In 2007, the United State Court of Appeals for the Eleventh Circuit also

affirmed a grant of summary judgment in favor of several school district

defendants in an excessive force action with similar facts to this one. The conflict

in Peterson v. Baker arose when an eight-grade reading teacher told one of two

disruptive students to leave her classroom, but the second student got up from his

seat and attempted to leave as well.[265] The student refused to sit back down

"because he wanted to leave."[266] The teacher then yelled at the student and shook

her finger in his face.[267] "As he moved toward the classroom door, the teacher

placed her left arm across the doorframe, again instructing [him] to take his

seat."[268]

---

[263] Kurilla v. Callahan, 68 F. Supp. 2d 556, 560 (M.D. Pa. 1999).

[264] Bridges ex rel. D.B. v. Scranton Sch. Dist., 66 F. Supp. 3d 570, 575–76 (M.D. Pa. 2014), aff'd, 644 F. App'x 172 (3d Cir. 2016).

[265] Peterson v. Baker, 504 F.3d 1331, 1334 (11th Cir. 2007).

[266] Id.

[267] Id.

[268] Id.

Subsequently, the student attempted to move the teacher's hand from the door.[269] When the student reached for the doorknob, the teacher grabbed his neck, squeezing it to the point that the student claimed that "he was starting not to be able to breathe."[270] The teacher then let go of his neck, and her student proceeded to leave the room.[271] "As [the student] left the classroom, he turned back to the teacher, cursed at her, and told her never to put her hands on him again."[272]

The district court granted summary judgment in full in favor of the defendants, and the Eleventh Circuit "[s]eeing no reversible error," affirmed that decision.[273] Applying the same general set of factors enumerated in Gottlieb, the Eleventh Circuit concluded that the teacher's use of force "was not obviously excessive."[274] Moreover, the Court noted that "we cannot say that the amount of force at issue here was totally unrelated to a need for punishment."[275] After all, "[t]he student had defiantly disobeyed the teacher's repeated instructions to be seated; and, more important, he had used physical force against the teacher."[276]

---

[269] Id.

[270] Id. at 1334–35.

[271] Id. at 1335

[272] Id.

[273] Id. at 1334.

[274] Id. at 1337.

[275] Id.

[276] Id.

The injuries sustained by I.B. at the core of the instant matter were quite plainly the result of a mere accident, brought on by his own insubordination. Judge Weis's observation regarding the disconnect between injury and intent is particularly prevalent in this case. Given the awkward angle at which I.B. darted toward the door and the incidental contact (if any) employed by Ms. Satteson, a reasonable jury simply would not conclude that the boy's injuries were anything other than accidental and largely self-inflicted. As another district court has previously observed: "It is unquestioned that [the plaintiff] sustained serious injury, but not all instances of injury automatically lead to an award of damages. Not all accidents are the legal fault of another."[277] To reason to the contrary would be to open the doors of the federal courthouse to any bumps and bruises occasioned by a schoolchild's inherent mischievousness. Accordingly, I deem it unnecessary to force half of Shikellamy's students and faculty to join me in Williamsport for a weeklong trial arising out of I.B.'s misbehavior.

Moreover, despite the instant injury that I.B. sustained, his deposition revealed no long-term injury, except perhaps an entrenched grudge harbored by him or his parents. As I.B.'s own deposition testimony reveals, this litigation in his mind is just as much about making a statement and inflicting retribution on another than it is about making a truly injured individual whole again. I.B. made the

---

[277] Harlan v. Frazier, 635 F. Supp. 718, 723 (W.D. La. 1986), aff'd, 811 F.2d 601 (5th Cir. 1987), and aff'd, 811 F.2d 601 (5th Cir. 1987).

following comment in his deposition, after admitting that he suffers from no

residual physical complications, and only his barber can typically notice any scar:

A. My mother was very upset about it, and she did talk to some other parents, that she wants what's right done. And she wants to make sure they're accountable.

Q. What does your mother want?

A. She doesn't—

. . .

Q. So getting back to my original question, what is your mother looking for?

A. Justice, accountability.

Q. And what does that mean though? What does she want?

A. For her to pay for what she's done.

Q. For what?

A. For her to pay for what she's done.

Q. Well, how?

A. Whatever way makes her realize what she did was wrong.

Q. I'm trying to understand. Pay in what way? Fire her from the school?

A. I don't know.

Q. Okay. I thought you knew.

A. I don't know what my mom wants.

Q. Are you okay now, though?

A.     Physically, yes.[278]

When we say modern-day schools and teachers function <u>in loco parentis</u>, literally "in the place of" a child's parents, that term conveys certain responsibilities, yet it carries with it certain rights as well. Too often, litigators forget that latter corollary: if they are to be charged with ensuring their pupils' safety, today's teachers must necessarily be afforded some leeway to safeguard as much.

The reality is that cases such as these have the power to influence behavior, and courts should constantly remain mindful of the consequentialist nature of their decisions. The simple question is: how would society most desire teachers like Ms. Satteson carry themselves in similar circumstances in the future? The number of iterations for similar fact patterns is exceptionally large and correspondingly varied. What, for instance, if the next Ms. Satteson must block a hyperactive student from exiting a school building onto a nearby busy street? What if she needs to block an open doorway between two students who are engaged in a physical altercation? Or, what if, as here, she simply is attempting to restrain a disobedient student and redirect him to the office? Certainly, the appropriate response cannot be to let the student run free, to let the fight rage on, or to let the student leave the

---

[278] I.B. Dep. at 144:23–145:04;148:07 –149:03.

premises without punishment. That would be a chaotic regime in which schools and teachers were deprived of the power necessary to fulfill their lawful duties.[279]

Unfortunately, neither do such circumstances permit those hypothetical teachers to call timeout and weigh a number of considerations that could be relevant to a multi-factor balancing test. Ms. Satteson was confronted with a pressing dilemma and based upon the student's conduct, was forced to respond to it in strikingly little time. When I.B. forced her hand, she could have decided to let him run from the building or she could have required him to stay. My task as a federal judge is not to second guess her decision, to say whether it was or was not the most proper one pedagogically speaking. Rather, it is simply to determine whether it violated I.B.'s constitutional rights. Because it clearly did not, summary judgment is warranted.

---

[279] In my view and in consideration of the tenor of the decision in Gottlieb, these hypothetical teachers would likely not face any liability whatsoever. In fact, the Gottlieb court explained as follows:

> In such cases where a school official grabs a student to break up a fight, chokes a student when hearing him curse, or paddles a student for misbehaving, the reason that the administrator resorts to force is evident. At the very least, the force must be capable of being construed as an attempt to serve pedagogical objectives.

Id. at 174.

3. **Ms. Satteson is also shielded by qualified immunity, because it would not be "beyond debate" to every reasonable teacher in her shoes that her response under the circumstances constituted "clearly established" excessive force.**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[280] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[281] "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[282] However, "qualified immunity is inapplicable to a state law cause of action."[283] Thus, as should be noted for our purposes here, "[a] qualified immunity analysis does not apply to a pendent state claim."[284]

"Decision of this purely legal question permits courts to expeditiously weed out suits which fail the test without requiring a defendant who rightly claims

---

[280] Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).

[281] Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

[282] Id. (internal quotation marks omitted).

[283] Miller v. New Jersey, 144 F. App'x 926, 929 (3d Cir. 2005).

[284] Id.

qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits."[285] "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."[286]"Indeed," the Supreme Court of the United States has "made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery."[287] "Accordingly, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."[288]

In Saucier v. Katz, the Supreme Court established a two-step process for resolving claims of qualified immunity: "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[289] "For the official to have 'fair warning' that his or her actions violate a person's rights, the contours of the right must be sufficiently clear

---

[285] Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1991).

[286] Id.

[287] Pearson, 555 U.S. at 231 (second internal quotation marks omitted).

[288] Id. at 232 (internal quotation marks omitted).

[289] Pearson, 555 U.S. at 232 (citing Saucier v. Katz, 534 U.S. 194, 201 (2001)).

that a reasonable official would understand that what he is doing violates that right."[290]

"This two-step procedure, the Saucier Court reasoned, is necessary to support the Constitution's elaboration from case to case and to prevent constitutional stagnation."[291] "The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."[292]

In Pearson v. Callahan, Justice Samuel A. Alito, Jr., writing for the Supreme Court, explained that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory."[293] "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[294]

Pertinently, in Mullenix v. Luna, a November 2015 decision, the Supreme Court emphasized as follows:

---

[290] Burns v. PA Dep't of Corr., 642 F.3d 163, 176 (3d Cir. 2011) (internal quotation marks and citations omitted).

[291] Pearson, 555 U.S. at 232 (quoting Saucier, 533 U.S. at 201).

[292] Pearson, 555 U.S. at 232 (quoting Saucier, 533 U.S. at 201).

[293] Pearson, 555 U.S. at 236.

[294] Id.

We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.[295]

Collecting the above case law, the Supreme Court has summarized that a state actor "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate."[296] In conjunction with that summation, the Honorable Thomas I. Vanaskie, writing for the Third Circuit, has further clarified that "for a right to be clearly established, there must be applicable precedent from the Supreme Court" or "a robust consensus of cases of persuasive authority in the Courts of Appeals."[297] Moreover, as recently as 2016, the Third Circuit, following that same standard, noted that public school teachers may be shielded by qualified immunity.[298]

Applying that body of law, I hold that Plaintiffs' attempt to strip away Defendants' entitlement to qualified immunity by cherry-picking generic due

---

[295] 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted).

[296] <u>City & Cty. of San Francisco, Calif. v. Sheehan</u>, 135 S. Ct. 1765, 1774 (2015) (Alito, J.) (internal citations and quotation marks omitted).

[297] <u>Spady v. Bethlehem Area Sch. Dist.</u>, 800 F.3d 633, 639 (3d Cir. 2015), <u>cert. denied sub nom. Spady v. Rodgers</u>, 136 S. Ct. 1162 (2016).

[298] <u>L.R. v. Sch. Dist. of Philadelphia</u>, 836 F.3d 235, 241 (3d Cir. 2016) (Fuentes, J.).

process quotations from hoary cases must fail. Such argumentation is expressed "at much too high a level of abstraction"—in clear contravention of the Third Circuit's recent decision in <u>Zaloga v. Borough of Moosic</u>.[299] In <u>Zaloga</u>, the Third Circuit made explicit that "it is not sufficient to conclude" that a generalized right against government interference with a protected right exists.[300] Rather, the district court "must attend to context" and "consider . . . the circumstances confronting [the state actor]" at that particular moment in time.[301] This construction ensures that judicial emphasis remains zeroed in on the core question in qualified immunity cases: "whether a reasonable state actor could have believed his conduct was lawful."[302]

In addition, the Third Circuit in its September 2015 decision <u>Spady v. Bethlehem Area School District</u>, reversed a district court that had deprived a physical education teacher of qualified immunity where a student suffered "a rare form of asphyxiation" after the teacher required him to resume swimmingly lessons following an apparent ingestion of a small amount of water.[303] Judge Vanaskie, writing for the unanimous panel, explained that "[t]o equate the intentional infliction of painful corporal punishment . . . with a student-athlete's unfortunate accident during wrestling practice or a rare instance of delayed

---

[299] 841 F.3d 170, 175 (3d Cir. 2016) (Jordan, J.).

[300] <u>Id.</u>

[301] <u>Id.</u>

[302] <u>Id.</u>

[303] 800 F.3d at 635.

drowning after swim class is a bridge too far" in the context of qualified immunity.[304] Instead, the panel went on to note that "courts that have found colorable constitutional violations" in excessive force cases, "did so where state actors engaged in patently egregious and intentional misconduct, which is notably absent from this case."[305]

By way of another example, although the Eleventh Circuit did not address the question of qualified immunity in <u>Peterson v. Baker</u> (cited above), the district court in that case did uphold the teacher's entitlement to qualified immunity, noting that "the law [had] not sufficiently established that <u>de minimus</u> injuries inflicted by corporal punishment for obvious student misconduct constituted a due process violation."[306]

Therefore, under this construction of the law, Plaintiffs have failed to show "a consensus of cases of persuasive authority" indicating that any reasonable teacher in Ms. Satteson's shoes would have realized "beyond doubt" that her response to I.B. was violative of his due process rights, particularly in light of his "obvious" and ongoing misconduct. Defining the right narrowly and in light of the circumstances, that a student was constitutionally free from incidental contact like "a bump" (if any) in response to verbal threats and insubordination was not and is

---

[304] <u>Id.</u> at 640.

[305] <u>Id.</u> at 641.

[306] <u>Peterson</u>, 504 F.3d at 1335 n.2.

still not a clearly established right. In fact, because it would ring contrary to established law, it is likely never to be an established right.

Rather, this was a case of authorized force (if at all) that may have led to a freak accident. A reasonable teacher in Ms. Satteson's position could easily have concluded that her response was lawfully authorized, and in view of I.B.'s blatant and persistent misconduct, it likely was. Accordingly, Plaintiffs have demonstrably failed to strip away the cloak of qualified immunity that shrouds state actors like public school teachers during the performance of their day-to-day duties.

**B.** **Summary Judgment Is Also Warranted As To Plaintiffs' State Law Tort Claims, Because Ms. Satteson's Conduct Did Not Exhibit The Requisite Character Of Intent Required By Law.**

**1.** **There is no genuine dispute of material fact that Ms. Satteson did not "desire to cause the consequences of her act" or "believe the consequences are substantially certain to result from it."**

Plaintiffs also allege three intentional torts against Ms. Satteson arising out of the same conduct that gave rise to the § 1983 claim: battery, assault, and intentional infliction of emotional distress. Although this Court, having granted summary judgment in full on the federal anchor claim, could remand the remainder of this action to the Court of Common Pleas of Northumberland County, I decline to proceed in such a fashion, as I believe judicial economy to be furthered by the same tribunal ruling, once and for all, upon similar claims that stem from the same body of operative facts.

In Pennsylvania, "an assault is an act intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and . . . the other is thereby put in such imminent apprehension."[307] "A battery, on the other hand, occurs when a person acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and . . . a harmful contact with the person of the other directly or indirectly results."[308]

Assault, battery, and intentional infliction of emotion distress are—in contrast to torts sounding in negligence—intentional torts, because they require that the tortfeasor have intended the reasonably foreseeable consequences of her actions. As another federal court in the Third Circuit's vicinage has commented while interpreting Pennsylvania tort law, "[t]he Second Restatement of Torts, on which the highest courts of Pennsylvania regularly rely, clearly provides that intent exists when 'the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it.'"[309] In fact, as Pennsylvania state courts have held, liability for intentional torts is bounded "to the desired consequences and to the consequences substantially certain to follow from

[307] Szydlowski v. City of Philadelphia, 134 F. Supp. 2d 636, 639 (E.D. Pa. 2001).

[308] Id.

[309] Scioto v. Marple Newtown Sch. Dist., No. CIV. A. 98-2768, 1999 WL 972011, at *4 (E.D. Pa. Oct. 22, 1999) (quoting RESTATEMENT (SECOND) OF TORTS, § 8A (1965).

the act."[310] Another has stated that "[i]n determining whether an actor intends his harm, we utilize the definition set forth in Restatement (Second) of Torts § 8A."[311]

Section § 8A of the Restatement (Second) of Torts, excerpted above, explains that "intent" as used throughout the Restatement's sections turns upon "the consequences of an act rather than the act itself."[312] It offers the following example: "When an actor fires a gun in the midst of the Mojave Desert, he intends to pull the trigger; but when the bullet hits a person who is present in the desert without the actor's knowledge, he does not intend that result."[313] A subsequent illustration presents the following hypothetical: "On a curve in a narrow highway, A, without any desire to injure B, or belief that he is substantially certain to do so, recklessly drives his automobile in an attempt to pass B's car."[314] In that example "A is subject to liability to B for his reckless conduct, but is not liable to B for any

---

[310] Field v. Philadelphia Elec. Co., 388 Pa. Super. 400, 417 (1989). In fact the Third Circuit itself has had occasion to opine upon the "common law background" of the meaning of "intent," noting, consistent with the above definition, that "the word 'intent . . . denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." In re Conte, 33 F.3d 303, 308 (3d Cir. 1994) (Becker, J.). See also Daniels v. Lutz, 407 F. Supp. 2d 1038, 1049 (E.D. Ark. 2005) ("To prevail on her battery claim, the Plaintiff need not prove that Ms. Lutz intended to cause harm, but rather only that she intended to cause "some harmful or offensive contact" or that she "acted with the intent to create the apprehension of some harmful or offensive contact" and that "a harmful or offensive contact").

[311] Donegal Mut. Ins. Co. v. Baumhammers, 2006 PA Super 32, ¶ 72, 893 A.2d 797, 822 (2006), aff'd in part, rev'd in part, 595 Pa. 147 (2007). Accord United Servs. Auto. Ass'n v. Elitzky, 358 Pa. Super. 362, 369 (1986).

[312] RESTATEMENT (SECOND) OF TORTS, § 8A cmt. a.

[313] Id.

[314] Id. at cmt. b.2.

intentional tort."[315] As expressed in another Restatement example that draws from the timeless case <u>Vosburg v. Putney</u>, one student cannot be liable to the other for battery for a mere shin kick, without first "intending an offensive contact."[316]

Plaintiffs offer nothing more than mere speculation to support their tort claims against Ms. Satteson. They contend that a common law battery claim must lie because I.B. believes that Ms. Satteson's body contacted his at some point during his fall. That is insufficient as a matter of law. As discussed earlier, objective indicia of purposeful contact on Ms. Satteson's part in a way that would conjure up a genuine dispute of material fact are absent from the record. No witness testified that Ms. Satteson raised her voice or used foul language toward I.B. She did not reach out and grab his clothing. Neither did she put out her arms and forcefully push him. The most severe version of the facts is that the teacher may have shifted her hips and "bumped" I.B. as he ducked and darted toward the door she was holding. A "bump" is not a harmful or offensive contact under the law, and based upon the evidence in the record, I am hard-pressed to conclude that any reasonable juror could find that anything more than a "bump" even occurred.

In fact, Ms. Satteson herself stated that she does not even believe the two made any contact when I.B. darted toward the door. I.B.'s suggestion that he felt a

---

[315] <u>Id.</u>

[316] Restatement (Second) of Torts, § 16 cmt. a.1.

portion of her body contact his own at some point shows nothing other than the two may have come in contact with each other. It in no way suggests that Ms. Satteson initiated the contact or indicates the extent of the force employed if such contact was even made. Just the same, her conduct was consistent with blocking a door to prevent the student's exit without permission, and under the circumstances of this case, such a response was clearly warranted. Importantly, considered from a different perspective, neither do facts presented suggest that I.B. initiated the contact or intended to strike her with his body or the door and therefore should be liable for battery or assault. Rather, I am left with a record of ineffectual facts that do not give rise to genuine disputes of material fact warranting trial.

In essence, this case simply cannot be permitted to be placed into the hands of a jury, as Plaintiffs have offered no satisfactory response to the following question: What evidence would be presented at trial to show that Ms. Satteson intentionally pushed I.B.'s head into the door's push bar? Because Plaintiffs have failed to answer that question—and likely cannot as a matter of law based upon the record as it exists today—summary judgment on the intentional tort claims is warranted.

By way of analogy, Professors Prosser and Keeton have explained that some amount of contact is reasonably to be expected in "a crowded world":

In a crowded world, a certain amount of personal contact is inevitable and must be accepted. Absent expression to the contrary, consent is assumed to all those ordinary contacts which are customary and reasonably necessary to the common intercourse of life, such as a tap on the shoulder to attract attention, a friendly grasp of the arm, or a casual jostling to make a passage.

The time and place, and the circumstances under which the act is done, will necessarily affect its unpermitted character, and so will the relations between the parties. A stranger is not to be expected to tolerate liberties which would be allowed by an intimate friend. But unless the defendant has special reason to believe that more or less will be permitted by the individual plaintiff, the test is what would be offensive to an ordinary person not unduly sensitive as to personal dignity.[317]

In fact, the "crowded world doctrine," as it is called, has been applied by one state court that upheld dismissal of a battery claim against a teacher who, during a fire drill, allegedly pushed an individual in the back, which contact resulted in that person's falling down a stairwell.[318] The court in that case reasoned as follows:

Individuals standing in the middle of a stairway during the fire drill could expect that a certain amount of personal contact would be inevitable. Rosen had a responsibility to her students to keep them moving in an orderly fashion down the stairs and out the door. Under these circumstances, Rosen's touching of Wallace's shoulder or back with her fingertips to get her attention over the noise of the alarm cannot be said to be a rude, insolent, or angry touching. Wallace has

---

[317] W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS, § 9, at 42 (5th ed. 1984). See also Wagner v. State, 2005 UT 54, ¶ 54, 122 P.3d 599, 609 ("Because the law defines "harmful and offensive" with reference to the mores of polite society, and protects against invasions of bodily integrity perpetrated outside those bounds, whether consent is assumed also depends upon who is making the contact.").

[318] Wallace v. Rosen, 765 N.E.2d 192 (Ind. Ct. App. 2002).

failed to show that the trial court abused its discretion in refusing the battery instruction.[319]

With that background in mind, I reiterate the rather demanding yet pragmatic standard a district court must apply at the summary judgment stage: "a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party."[320] "The nonmoving party must present more than a scintilla of evidence showing that there is a genuine issue for trial."[321] "Further, the nonmoving party must come forth with affidavits and evidence in support of their position; merely relying on the pleadings and the assertions therein is insufficient to demonstrate a genuine issue of material of fact."[322] The importance of strict adherence to that standard becomes particularly clear to a district court after he has had the experience of presiding over a trial in a case that should have been brought to a close on dispositive motions practice.

Likewise, Plaintiffs' briefing in my view fails to adequately grapple with the notion that their son was an aggressor and that Ms. Satteson's conduct was a valid defensive response to his threats. As one state court has previously discussed, contact that may amount to a battery in another context is often excusable in the

---

[319] Id. at 198.

[320] Evans v. Portfolio Recovery Assocs., LLC, No. 15-1455 (RBK/JS), 2016 WL 4059645, at *2 (D.N.J. July 27, 2016).

[321] Id. (internal quotations and citation marks omitted).

[322] Id.

academic environment so long as the defendant teacher "was appropriately maintaining classroom order and discipline."[323]

The appeals court in that case affirmed the lower court's judgment entered in favor of a teacher who had grabbed a disruptive students arm and "propelled" him toward the classroom door.[324] The student struck a podium and a classroom blackboard before he was forced to exit.[325] The appellate court concluded that the teacher "reacted to what he perceived as a potentially explosive situation" and commented as follows:

> The primary objective of school officials and teachers is the education of the young people in their charge. If a teacher, or principal, is unable to establish discipline and maintain an orderly learning environment, the objective of education cannot be met. In today's society, where educators must compete for their students' attention against numerous outside influences, there is a greater necessity to ensure that students are given the opportunity to learn in a positive and orderly environment free from distractions.[326]

As one Pennsylvania court has similarly recognized, "Under ordinary circumstances, this would be a battery, but by reason of the fact that Mr. Ebert was a teacher in a public school in Marysville, he had a right not only to place his hands upon his pupils, but to punish them in case of an infraction of the rules."[327]

---

[323] <u>Frame v. Comeaux</u>, 98-1498 (La. App. 3 Cir. 4/21/99), 735 So. 2d 753, 755.

[324] <u>Id.</u>

[325] <u>Id.</u>

[326] <u>Id.</u> at 754–55.

[327] <u>Com. v. Ebert</u>, 1901 WL 3042, at *1 (Pa. Quar. Sess. 1901).

A reasonable reading of the above authorities leads to a singular conclusion: by the sheer nature of the academic setting, a contact that might be considered tortious in a different context, when committed by a teacher or related official in an effort to maintain or restore order, will likely not expose that school employee to tort liability. Such a rule "is not a blanket approval of all disciplinary actions taken by schools simply because they are alleged to be necessary to maintain order and facilitate learning."[328] "Rather . . . each case must be considered on the facts and circumstances present therein."[329] These defenses or justifications available to well-intentioned public school teachers provide a further ground that warrants the entry of summary judgment.

In sum, not only is the record here bereft of any suggestion that Ms. Satteson intended to cause a harmful or offensive contact, but Plaintiffs have not demonstrated a genuine issue of fact that she intended to contact I.B. whatsoever. Serious issues pertaining to causation, justification, and damages also permeate Plaintiffs' intentional tort. Thus, given that Plaintiffs have failed to adduce sufficient evidence to create a genuine dispute of material fact on this front, their battery claim against Ms. Satteson must also fail.

---

[328] Frame, 735 So. 2d at 756.

[329] Id.

As other courts have recognized, battery and assault "go together like ham and eggs," and Plaintiffs' assault claim is therefore doomed on similar grounds.[330] First and most apparently, the record reveals that Ms. Satteson acted with valid pedagogical motives to restore order and instill discipline, not to for the sole reason of placing I.B. in apprehension of an imminent harmful or offensive contact. Independently, because the record also indicates that the physical contact endured by I.B. (if any) was not harmful or offensive, I consequently find that Ms. Satteson could not have been threatening or attempting a contact of that nature either.

The icing on the cake of this questionable action is a claim for intentional infliction of emotional distress against Ms. Satteson. Under Pennsylvania law, "[t]o state a claim for intentional infliction of emotional distress, a plaintiff must plead that the defendant's conduct: (1) was intentional or reckless; (2) was extreme and outrageous; (3) actually caused the distress; and (4) caused distress that was severe."[331]

"Furthermore, a plaintiff must demonstrate physical injury or harm to sustain a cause of action for intentional infliction of emotional distress."[332] Thus, "[a] plaintiff seeking to establish intentional infliction of emotional distress must also

---

[330] Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 411 (4th Cir. 2013).

[331] Regan v. Twp. of Lower Merion, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999).

[332] K.A. ex rel. J.A. v. Abington Heights Sch. Dist., 28 F. Supp. 3d 356, 376 (M.D. Pa. 2014) (Mariani, J.).

support his claim with competent medical evidence, because it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's outrageousness without expert medical confirmation that the plaintiff actually suffered the claimed distress."[333]

"In order to state a cognizable claim, the conduct must be so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to civilized society."[334] "Generally, the case must be one with respect to which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"[335]

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[336] "[P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."[337] Thus, it has been said that "[t]here is no occasion for the law to intervene in every

---

[333] Lawson v. Pennsylvania SPCA, 124 F. Supp. 3d 394, 409 (E.D. Pa. 2015) (internal quotation marks omitted).

[334] Id. (internal quotation marks omitted).

[335] Robinson, 246 F. Supp. 2d at 444 (internal quotation marks omitted).

[336] Hunger v. Grand Cent. Sanitation, 447 Pa. Super. Ct. 575, 584, 670 A.2d 173, 177 (1996).

[337] Id.

case where someone's feelings are hurt."[338] "Perceived unkindness has no remedy at law."[339]

Accordingly, a claim for intentional infliction of emotional distress must be dismissed where "[t]he defendants' alleged conduct is simply not sufficiently outrageous to sustain a claim of intentional infliction of emotional distress."[340] As such, "[w]ith regard to the element of outrageousness, it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery."[341]

Remaining faithful to the above legal rules, summary judgment must also be entered on Plaintiffs' intentional infliction of emotional distress claim. Final disposition of this claim reveals the preposterous nature of charges such as these when levied against schoolteachers. Federal courts will surely be disinclined to hold that any serious reprimand of a student constitutes intentional infliction of emotional distress. That view would unnecessarily restrict the disciplinary means

---

[338] Id.

[339] Zaloga v. Borough of Moosic, No. 3:10-CV-2604, 2015 WL 3755003, at *11 (M.D. Pa. June 16, 2015).

[340] See Goodson v. Kardashian, 413 F. App'x 417, 418 (3d Cir. 2011).

[341] Johnson v. Caparelli, 425 Pa. Super. Ct. 404, 412, 625 A.2d 668, 671 (1993). See, e.g., Snyder v. Specialty Glass Products, Inc., 658 A.2d 366 (Pa. Super. Ct. 1995) (summary judgment granted in favor of defendant because plaintiff employee's suffering verbal abuse and demotion after arriving late to work was not outrageous as a matter of law); Ruder v. Pequea Valley Sch. Dist., 790 F.Supp.2d 377, 398 (E.D. Pa. 2011) (motion to dismiss granted because defendant's failure to provide the plaintiff with medical leave and benefits, and its subsequent termination of the plaintiff, was not outrageous as a matter of law).

of the average school and would place too much weight on the fickle emotions of modern schoolchildren. The conduct around which this case revolves is not the kind abhorrent to those of us who purport to live civilly. Quite the opposite, the evidence indicates that Ms. Satteson's conduct was actually calculated to restore order. Everyday reprimands cannot give rise to an action in tort.

Several members of this Court have confirmed that school-based fact patterns akin to this one are simply not the type of cases meant to shoulder an intentional infliction of emotional distress claim. For instance, the Honorable Yvette Kane dismissed an intentional infliction of emotional distress claim against an assistant principal who had allegedly sexually assaulted a female student because, as here, "the complaint allege[d] emotional distress, but d[id] not allege physical manifestation of that distress."[342] To that end, I note that the lack of physical manifestations of I.B.'s purported emotional distress is a significant barrier to relief here. In addition, the Honorable Robert D. Mariani dismissed such a claim where school officials locked a student in a room for seven hours, questioned him about drugs, and did not allow him to seek counsel or call his parents.[343] Lastly, the Honorable Malachy E. Mannion granted summary judgment in favor of a teacher who verbally assaulted a student in front of the entire class by

---

[342] M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014).

[343] K.A. ex rel. J.A. v. Abington Heights Sch. Dist., 28 F. Supp. 3d 356, 377 (M.D. Pa. 2014).

yelling vituperations like "Shut up!" and "You're going to have the worst year ever!"[344]

      The reality of this case is that it also stems from a brief one-off altercation between a teacher and a student. This exchange is simply not of the persistently "egregious" or "outrageous" nature such that in an academic setting it would give rise to physical manifestations of emotional distress. To the extent that the Plaintiffs wished to recover for expenses associate with I.B.'s short-lived hospitalization, the more appropriate avenues were those already discussed. As other federal courts have concluded, intentional inflection of emotional distress claims are properly dismissed where the underlying claim "is duplicative of [ ] other claims and comes within the ambit of other torts."[345] For the foregoing reasons, Plaintiffs have failed to raise a genuine dispute of material fact in regard to their intentional tort claims against Ms. Satteson.

---

[344] <u>L.H. v. Pittston Area Sch. Dist.</u>, 130 F. Supp. 3d 918, 924 (M.D. Pa. 2015), aff'd, 666 F. App'x 213 (3d Cir. 2016).

[345] <u>Allam v. Meyers</u>, No. 09 CIV. 10580 KMW, 2011 WL 721648, at *6 (S.D.N.Y. Feb. 24, 2011).

### 2. Ms. Satteson is shielded by the Political Subdivision Tort Claims Act, because the evidence does not support the claim that she acted with "actual malice" or engaged in "willful misconduct."

The Third Circuit has confirmed that local agencies, such as school districts, are given "broad tort immunity."[346] The Act provides that, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[347] "Municipal <u>employees</u>, including school district employees, are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment."[348]

Nevertheless, Pennsylvania's General Assembly excepted from immunity an employee's "willful misconduct."[349] That exception provides as follows:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.[350]

---

[346] <u>Sanford v. Stiles</u>, 456 F.3d 298, 315 (3d Cir. 2006) (per curiam).

[347] 42 Pa. Cons.Stat. § 8541.

[348] <u>Sanford</u>, 456 F.3d at 315 (citing 42 Pa. Cons.Stat. § 8545).

[349] 42 Pa. Cons.Stat. § 8550.

[350] <u>Id.</u>

The Pennsylvania Supreme Court has recognized that willful misconduct is "a demanding level of fault."[351] In fact, that Court has defined the term as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied."[352] In other words, "the term 'willful misconduct' is synonymous with the term 'intentional tort.'"[353]

Although Plaintiffs allege that Ms. Satteson committed a number of intentional torts, the evidence presented is, in my view, insufficient to strip away the shroud of immunity that public schoolteachers enjoy. Rather, Pennsylvania state courts have held that mere allegations are insufficient to strip away sovereign immunity. Instead, immunity is not stripped away until sufficient evidence has been offered to establish that "willful misconduct" has in fact been committed by the state actor.[354] It would be wholly inapposite for courts sitting at the summary judgment stage with the benefit of a full record to ignore that complete body of evidence and rely solely on unsupported allegations in making a determination about immunity.

---

[351] Sanford, 456 F.3d at 315.

[352] Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289, 293 (1994) (citations omitted).

[353] Id. (internal citation omitted). See also Bright, 443 F.3d 276, 287 (3d Cir. 2006); Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir.2001).

[354] See, e.g., Scott v. Willis, 116 Pa. Cmwlth. 327, 334, 543 A.2d 165, 169 (1988) ("This exception strips employees of their governmental immunity if they are found to be guilty [sic] of intentional torts.").

There can be no doubt that Ms. Satteson's conduct was within the scope of her employment and was reasonably calculated to further the interests of her employer. To contrast by way of example, courts have denied immunity under the "willful misconduct" theory where an autistic support teacher struck her students on the legs and arms until they bruised, screamed in their faces, squeezed and crushed their arms until they bruised, stomped on their feet, and used restraints to tether them down.[355] The other common instances in which courts have typically precluded immunity are sexual abuse cases.[356]

For the same reasons stated earlier in this opinion, I do not believe that a reasonable jury could conclude that Ms. Satteson engaged in "willful misconduct." The facts simply do not bear out such a claim. As the Third Circuit concluded in regard to the guidance teacher in Sanford, the case simply does not entail facts that rise to the level of "willful misconduct" sufficient to deny a public actor immunity.[357] Therefore, she is entitled to immunity under Pennsylvania law on the intentional tort claims.

---

[355] Vicky M. v. Ne. Educ. Intermediate Unit 19, 486 F. Supp. 2d 437, 447 (M.D. Pa. 2007), on reconsideration, No. CIV.A. 3:06-CV-01898, 2007 WL 2844428 (M.D. Pa. Sept. 26, 2007).

[356] DiSalvio v. Lower Merion High Sch. Dist., 158 F. Supp. 2d 553, 562 (E.D. Pa. 2001).

[357] Sanford, 456 F.3d at 315.

**C. Summary Judgment Is Also Warranted As To Plaintiffs' Vicarious Liability Federal Policy or Practice Claims Against The Remaining School District Defendants, Because No Policy Or Practice Countenancing The Use Of Excessive Force Existed.**

Plaintiffs also allege that the remaining school district Defendants beside Ms. Satteson should be held liable "for their conduct in endorsing a custom of approving [Ms.] Satteson's forceful, punitive, and violent actions toward students."[358] That claim is simply contrary to fact and well short of the applicable legal standard for vicarious liability in the constitutional arena. After <u>Monell v. Department of Social Services of the City of New York</u>, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."

"Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[359] "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."[360]

---

[358] ECF No. 1 at ¶ 43.

[359] 436 U.S. 658, 694 (1978).

[360] <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823–24 (1985).

"Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved."[361]

The policy requirement set forth in Monell stems from the fact that a governmental entity "is not liable under the doctrine of respondeat superior" for constitutional claims.[362] As the Beck court elaborated, a government policy or custom under Monell must be proven in one of two ways:

> Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well settled as to virtually constitute law.[363]

Accordingly, "[s]ingular disputes between parties who may have shared a rocky relationship in the past is not enough to satisfy the Monell's policy requirement, which serves 'as a means of determining which acts by municipal employees are properly attributed to the municipality.'"[364]

---

[361] Id.

[362] Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (Rosenn, J.).

[363] Id. at 1480 (internal citations and quotations marks omitted).

[364] Anything to Rent Lease Wholesale, Inc. v. Hughesville Borough, No. 4:16-CV-00895, 2017 WL 736859, at *6 (M.D. Pa. Feb. 24, 2017) (Brann, J.) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 139 n.3 (1988)). See, e.g., Tuttle, 471 U.S. at 824 ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.") (internal footnote omitted).

With that background in mind, Plaintiffs' claims against the remaining school district Defendants are particularly weak. The named district officials and the district itself did not put in place a policy or custom endorsing the indiscriminate deployment of excessive force against students. To the contrary, the record is uncontroverted that the opposite was actually true: the district and its supervisory officials regularly conducted on-the-job training programs during in-service sessions that focused on tactics for dealing with disruptive students. Those programs included discussions of "de-escalation" and other nonconfrontational approaches. Force was not countenanced unless it was necessary to ensure the safety of faculty, staff, or students. The corollary holds equally true here: because the school district practiced a policy of de-escalation to which Ms. Satteson adhered, neither can it be said that there was any negligent failure to train.

To the extent that the Plaintiffs may contend that, factually, this situation did not play out as the training would have recommended, I believe that is immaterial, and nevertheless, I would disagree. In my view, Ms. Satteson and Ms. Knopp did attempt adequate de-escalation tactics when they asked I.B. to apologize to discern whether he knew what he did was wrong and accepted responsibility for his misbehavior. The record clearly reveals, however, that it was I.B. who escalated the situation when he rebuffed the teachers' attempts at a less eventful resolution. The only reason it was not adequately defused is that I.B. himself escalated the

situation to physical violence by darting toward Ms. Satteson and the glass door she was holding open, after he had made a verbal threat against her wellbeing.

Further, it goes without saying that because I have found as a matter of law that the facts are insufficient to give rise to a constitutional violation in the mind of a reasonable juror, there can be no vicarious liability imposed for an injury that does not exist in the first place.

I would quote directly from the Third Circuit panel's decision in Metzger, a 1988 case: "The other defendants were granted summary judgment as there was no school policy authorizing the conduct of which plaintiffs complained, there was no legal or factual basis for vicarious liability of the supervisors, and there was no showing that [the teacher] had received inadequate training."[365] As has been observed many times, Rule 11 specifies "that an attorney's signature on a pleading constitutes a certificate that he has read it and believes it to be well grounded in fact and legally tenable."[366] With clear federal law dictating this outcome, I am

---

[365] 841 F.2d 518, 520. I note for the record that the official school district Defendants would also be entitled to the same grants of immunity that Ms. Satteson enjoys. In fact, their case for immunity is even more robust than hers. Moreover, I note that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell, 436 U.S. at 691 n.55. "That being the case, it is a well-established practice in this Circuit to dismiss "redundant § 1983 claims asserted against public officers in their official capacities where a claim has also been made against the public entity that employs them." Jankowski v. Lellock, No. 2:13-CV-194, 2013 WL 5945782, at *9 n.6 (W.D. Pa. Nov. 6, 2013) (McVerry, J.). Accordingly, summary judgment is necessarily granted in favor of Defendants as to Plaintiffs' official capacity claims.

[366] Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 384 (1990).

quite unsure how a good faith investigation into these paltry facts warranted the pleading of federal constitutional claims here.[367]

## IV.    CONCLUSION

In my view, this case has wasted the Court's—and by extension, the public's—time and resources. I would encourage counsel for Plaintiffs to think long and hard about Judge Weis's admonition as quoted above before bringing future claims such as these: "[i]n devoting time and effort to litigation of this nature, federal courts deprive parties with cases raising federal questions of the attention they deserve. In my view, this case has gone far enough."

To the extent that this situation could have been avoided, I would also offer the following advice to I.B. (which advice he apparently has not received from his parents): apologize and accept the consequences of your actions. When I.B. was stopped by Ms. Satteson and Ms. Knopp, the purpose of that confrontation was not to impose some of form of cruel and unusual punishment. Rather, it was to identify the wrongful conduct and the wrongdoer, to ensure that I.B. appreciated that how he acted was inappropriate, to ensure that such conduct was not repeated, and to ensure that I.B. was justly punished.

---

[367] See, e.g., Keister v. PPL Corp., 318 F.R.D. 247, 263 (M.D. Pa. 2015) (imposing reasonable attorney's fees under Rule 11 for a "see what sticks" approach to pleading), aff'd Keister v. PPL Corp., No. 16-1552, 2017 WL 383366 (3d Cir. Jan. 27, 2017) (Fisher, J.).

I cannot help but to recognize that this process was frustrated and the confrontation escalated not by those teachers but by I.B.'s own poor decisions. As Ms. Satteson later remarked at her deposition when asked what punishment the boy riding the scooter received: "The young man on the scooter got no discipline referral. I felt like we were done with our business."[368]

Ultimately, the role of a federal court is to use good judgment. We must distinguish between those academic incidents that rise to the level of excessive force or tortious conduct and those that simply do not. A federal judge exercising his sound judgment based upon the record before him can readily distinguish the two—he will know it when he sees it. This is not one of those exceptional cases.

Consistent with the preceding analysis, no genuine disputes of material fact remain as to any of Plaintiffs' claims, and therefore, summary judgment is entered in favor of the Defendants in full.

An appropriate Order follows.

BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

---

[368] Satteson Dep. at 63:18–20.